# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

ROBERT D. MABE, INC., d/b/a :
Ashville Apothecary and
Circleville Apothecary, et al., :

  **Plaintiffs** : **CIVIL ACTION NO. 3:17-1102**

  **v.** : **(JUDGE MANNION)**

OPTUM RX, Successor by :
Merger to Catamaran Corp.,
       :
  **Defendant**
       :

## MEMORANDUM

Pending before the court is the defendant's motion to compel arbitration and dismiss non-arbitrable claims. (Doc. 42).

Plaintiffs are over 400 independent pharmacies challenging the reimbursements they receive from defendant and other pharmacy benefit managers ("PBMs"). Plaintiffs allege that the defendant's low Maximum Allowable Cost ("MAC") payments for generic prescription drugs breached their contracts and violated state laws regulating MAC prices. Specifically, plaintiffs allege that defendant has multiple MAC lists and MAC prices which it uses to reimburse mail order pharmacies and large chains such as CVS and Walgreens at higher "maximums" than the "maximum" it claims to pay

plaintiffs, and that the defendant charges a "spread" to health plans for prescriptions while it reimburses plaintiffs below their acquisition cost.

Plaintiffs allege that the contractual relationship between them and the defendant is based upon either the Provider Agreements and the Provider Manual, or the Provider Manual alone. The Provider Manual states, in part:

> If an independent Provider is affiliated with a third party contracting or purchasing group, the affiliated Provider is subject to all terms and conditions of the written agreement between Catamaran[1] and that entity. Communication should be directed through the third party contracting entity or purchasing group.

(Doc. 36-2, p. 19).

The Provider Manual further states:

> The Provider Manual is an extension of and incorporated into the Participating Provider Agreement and is incorporated into the Participating Provider Agreement with Catamaran. The Provider must adhere to the provisions and terms set forth in the Participating Provider Agreement. Lack of adherence to any of the provisions and terms of the Participating Provider Agreement, which includes the Provider Manual, and all other applicable documents are viewed as a breach of the Participating Provider Agreement.

(*Id.*, p. 2).

---

[1] The defendant is alleged to be the successor in interest to Catamaran Corporation.

The defendant points out that the Provider Agreements contain various provisions stating that the Provider Manual and the Provider Agreements form the agreement between the parties. Generally, the Provider Agreements state that the Provider Agreement "consists of this Enrollment Form ('Enrollment Form') and all the Terms and Conditions, including the Provider Manual, Addendum(s) and schedules thereto." (Doc. 26-1, Exhibits filed under seal).

All of the Provider Agreements contain one of two arbitration clauses:

**9.   DISPUTE   RESOLUTION**

. . . The parties will make a good faith effort to resolve any disputes arising during the term of this Agreement. . . [i]f they are unable to resolve the dispute in accordance with the procedures set forth in section 9.1 above, either party may submit the dispute to binding arbitration in accordance with the Rules for the Conduct of Arbitration of the American Arbitration Association (the "Rules") in effect at the date of commencement of such arbitration, by one (1) arbitrator who will be appointed by the American Arbitration Association.

or

**11.   DISPUTE   RESOLUTION**

Any controversy or claim arising out of or relating to this Agreement shall be settled by arbitration in accordance with the applicable rules of the American Arbitration Association and

> judgment upon the award rendered by the arbitrator or arbitrators
> may be entered in any court having jurisdiction thereof . . .

(*Id.*).

In the pending motion to compel arbitration, the defendant argues that the contracts upon which over 400 plaintiff pharmacies base their claims require arbitration. The defendant argues that, since the second amended complaint refers to the Provider Agreements and the Provider Manual and these documents form the basis of the plaintiffs' claims, the plaintiffs' duty to arbitrate is established by the allegations of the complaint, and its motion is properly considered under Fed.R.Civ.P. 12(b)(6) without the benefit of further discovery.

In *Guidotti v. Legal Helpers Debt Resolution, L.L.C.,* 716 F.3d 764 (3d Cir. 2013), the Third Circuit Court of Appeals clarified the appropriate standard to be applied to a motion to compel arbitration that is filed prior to discovery. The court held that, where the affirmative defense of arbitrability is apparent on the face of the complaint or those documents relied upon in the complaint, the standard under Federal Rule of Civil Procedure 12(b)(6) should be applied. *Id.* at 773-74. In those cases, the Federal Arbitration Act

("FAA"), 9 U.S.C. §1 *et seq*., would favor speedy resolution of the motion without the delay of discovery. *Id.* at 773.

"[A] more deliberate pace is required" when either (1) the complaint and documents referenced therein do not establish with "requisite clarity" that the parties agreed to arbitrate or (2) "the opposing party has come forth with reliable evidence that is more than a 'naked assertion . . . that it did not intend to be bound,' even though on the face of the pleadings it appears that it did." *Id.* at 774 (quoting *Somerset Consulting, LLC v. United Capital Lenders, LLC*, 832 F. Supp. 2d 474, 479 (E.D. Pa. 2011) and *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd*, 636 F.2d 51, 55 (3d Cir. 1980)). In those instances, the motion should be resolved according to the standard provided by Federal Rule of Civil Procedure 56. *Id*.

When the issue of arbitrability is not apparent on the face of the complaint, normally, "the motion to compel arbitration must be denied pending further development of the factual record." *Id*. "[A] restricted inquiry into the factual issues will be necessary to properly evaluate whether there was a meeting of the minds on the agreement to arbitrate, and the non-movant must be given the opportunity to conduct limited discovery." *Id*.

(internal citations and quotations omitted). After this, the appropriate standard to be applied is the standard provided by Rule 56.

Here, while plaintiffs reference the Provider Agreements and Provider Manual in the second amended complaint, plaintiffs have brought forth sufficient facts to place the agreement to arbitrate in issue. Normally, plaintiffs would be "entitled to discovery on the question of arbitrability before [this] court entertains further briefing" on the issue. *Guidotti*, 716 F.3d at 776 (quoting *Somerset*, 832 F. Supp. 2d at 482). However, at this stage of the litigation, the parties have already engaged in discovery and have submitted several supplemental filings with the court in relation to the issue of arbitrability. Denying the defendant's motion at this time solely to provide additional time for discovery would be inefficient, especially where the allowance of discovery to engage in the arbitrability analysis is, typically, quite limited. The court will therefore proceed to consider the defendant's motion under the appropriate standard.

"A party to a valid and enforceable arbitration agreement is entitled to a stay of federal court proceedings pending arbitration as well as an order compelling such arbitration." *Alexander v. Anthony Int'l, L.P.,* 341 F.3d 256,

263-64 (3d Cir. 2003); see also 9 U.S.C. §§3, 4. Judicial review over a dispute regarding arbitration is, initially, limited to a two-part inquiry. *CardioNet, Inc. v. Cigna Health Corp*., 751 F.3d 165, 172 (3d Cir. 2014). First, the court must determine whether "a valid agreement to arbitrate exists," and, second, whether "the particular dispute falls within the scope of the agreement." *Kirleis v. Dickie, McCamey & Chilcote, P.C.,* 560 F.3d 156, 160 (3d Cir. 2009); *see also id*. Here, the parties primary dispute falls within the first inquiry.

The initial question of whether the parties validly agreed to arbitrate is presumed to be a question for the court unless the parties clearly and unmistakably indicate otherwise. *Guidotti*, 716 F.3d at 773. Generally, there is a "liberal federal policy favoring arbitration" and a "fundamental principle that arbitration is a matter of contract." *AT&T Mobility*, 131 S. Ct. at 1745 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp*., 460 U.S. 1, 24 (1983) and *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010)). However, "before a party to a lawsuit can be ordered to arbitrate and thus be deprived of a day in court, there should be express, unequivocal agreement to that effect." *Guidotti*, 716 F.3d at 773 (quoting *Par-Knit Mills,* 636 F.2d at

54). Thus, the presumption in favor of arbitration is only applied once the court has determined that the parties "have consented to and are bound by the arbitration [agreement]." *Griswold v. Coventry First LLC*, 762 F.3d 264, 271 (3d Cir. 2014). Their agreement may be declared unenforceable by the court "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. §2; *see also AT&T Mobility, LLC v. Concepcion*, 131 S. Ct. 1740,1746 (2011).

There is no dispute in this case that the defendant bears the burden to show that the parties agreed to arbitrate. There is also no dispute that whether an agreement to arbitrate exists is a judicial determination based on the applicable state's contract law, which in this case is Illinois.

Plaintiffs' second amended complaint alleges that the Provider Manual "formed the basis for a meeting of the minds which governed the business relationship between the parties." (Doc. 34-2, p. 2). The Provider Manual states "[i]f an independent Provider is affiliated with a third party contracting or purchasing group, the affiliated Provider is subject to all terms and conditions of the written agreement between Catamaran and that entity." (Doc. 26-2, p. 19). The Provider Manual further sets forth that it "is an

extension of and incorporated into the Participating Provider Agreements[,]" and that the "Provider must adhere to the provisions and terms set forth in [the Provider Agreement]." (Doc. 36-2, p. 2). As set forth by the defendant, under Illinois state law, "[w]hen a contract incorporates another document by reference, the terms of that document become a part of the contract." *Bransky v. Schmidt Motor Sales, Inc.*, 584 N.E.2d 892, 895 (Ill. App. Ct. 1991); *Eul v. Tranworld Sys.*, 2017 WL 1178537, at *10 (N.D. Ill. Mar. 30, 2017). The defendant argues that because the Provider Manual incorporates the provisions and terms of the Provider Agreement, the terms of the Provider Agreement are binding on plaintiffs, including the arbitration clause.

Plaintiffs counter with a number of arguments. Initially, plaintiffs argue that a number of pharmacies were not affiliated with the PSAOs at the time the PSAO signed the Provider Agreements and that the Provider Agreements can only be binding on the PSAO's then existing members. As quoted above, nothing in the Provider Manual sets forth that only those providers affiliated with a PSAO at the time of the execution of the Provider Agreements are bound by the Agreements. In fact, the provision states that the pharmacy is subject to the terms of the Provider Agreements upon

affiliation with a PSAO, without any reference to when the pharmacy became affiliated. Therefore, the court finds this argument to be without merit.

Plaintiffs also argue, however, that it would be procedurally unconscionable to bind them to the arbitration agreement when the terms and conditions of the agreement were not accessible to them when they entered into the contractual relationship with the PSAOs. Procedural unconscionability exists when a contract term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware that he or she was agreeing to it. *Zuniga v. Major League Baseball*, ___N.E.3d___, 2021 WL 976958 (Mar. 16, 2021) (citing *Kinkel*, 223 Ill. 2d at 22, 306 Ill.Dec. 157, 857 N.E.2d 250).

> "'Procedural unconscionability consists of some impropriety during the process of forming the contract depriving a party of a meaningful choice. [Citations.] Factors to be considered are all the circumstances surrounding the transaction including the manner in which the contract was entered into, whether each party had a reasonable opportunity to understand the terms of the contract, and whether important terms were hidden in a maze of fine print; both the conspicuousness of the clause and the negotiations relating to it are important, albeit not conclusive factors in determining the issue of unconscionability. [Citation.] To be a part of the bargain, a provision limiting the defendant's liability must, unless incorporated into the contract through prior course of dealings or trade usage, have been bargained for, brought to the purchaser's attention or be

conspicuous. \*\*\* Nor does the mere fact that both parties are businessmen justify the utilization of unfair surprise to the detriment of one of the parties \*\*\*. [Citation.] This requirement that the seller obtain the knowing assent of the buyer "does not detract from the freedom to contract, unless that phrase denotes the freedom to impose the onerous terms of one's carefully drawn printed document on an unsuspecting contractual partner. Rather, freedom to contract is enhanced by a requirement that both parties be aware of the burdens they are assuming. The notion of free will has little meaning as applied to one who is ignorant of the consequences of his acts." [Citations.]'"

*Id.* (citing *Kinkel* at 23-24, 306 Ill.Dec. 157, 857 N.E.2d 250 (quoting *Frank's Maintenance & Engineering, Inc. v. C.A. Roberts Co*., 86 Ill. App. 3d 980, 989-90, 42 Ill.Dec. 25, 408 N.E.2d 403 (1980)). The doctrine of procedural unconscionability protects individual consumers who contract with commercial entities, as well as businesses that contract with other businesses. *Id.* (citing *Kinkel*, at 24, 306 Ill.Dec. 157, 857 N.E.2d 250).

Here, the record demonstrates that the Provider Manual incorporates the Provider Agreements. The Provider Agreement is entered into between the defendant and the PSAO. It is alleged that the individual pharmacies are local businesses whose customers are almost exclusively members of insurance plans. As such, in order to retain those customers, the pharmacies have little choice but to deal with companies like the defendant through

PSAOs. However, the record demonstrates that the defendant prohibits PSAOs from giving the Provider Agreement to the individual pharmacies without first gaining permission to do so and the defendant has never given such permission, making it impossible for the pharmacies to have any knowledge of the arbitration agreement to which the defendant now argues plaintiffs are bound.

Although the defendant argues that knowledge of the arbitration clause is imputed to plaintiffs through the PSAOs, such knowledge cannot be imputed to a principal when its agent is under a duty not to disclose that knowledge and to keep it confidential. "[T]he rule charging a principal with the knowledge of his agent is subject to the qualification that the agent is at liberty to communicate his knowledge to his principal and that it is his duty to do so." *Neuberg v. Clute*, 6 Ill.2d 58 (Ill. 1955).

This idea is also reflected in the Restatement of Agency:

For purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal, unless the agent:

(a)    acts adversely to the principal; or

      (b)     is subject to a duty to another not to disclose the fact
to the principal.

Restatement (Third) of Agency §5.03.

Considering the foregoing, the court finds that compelling plaintiffs to proceed with arbitration in this matter would be procedurally unconscionable. The defendant's motion to compel arbitration will therefore be denied.

Defendant also argues that a number of plaintiffs' non-arbitrable claims should be dismissed for failure to state a claim, including Counts I-IV, VI-X and XII. Initially, Counts I and II allege violations of Article II of the Uniform Commercial Code ("UCC"), while Counts VIII and IX raise claims of quantum meruit. Virtually identical claims were raised and rejected by the court in the parallel case of *Lakeview Pharmacy of Racine, Inc. v. Catamaran Corp.*, Civil Action No. 3:15-290. *See Lakeview Pharmacy of Racine, Inc. v. Catamaran Corp.*, 2015 WL 8331908 (M.D.Pa. Dec. 9, 2015) ("*Lakeview I"); Lakeview Pharmacy of Racine, Inc. v. Catamaran Corp.*, 2016 WL 3227258 (M.D.Pa. June 13, 2016) ("*Lakeview II")*. Plaintiffs acknowledge the court's previous rejection of these claims. As such, Counts I, II, VIII and IX of the second amended complaint will be dismissed.

Counts III and IV of the second amended complaint are based on an alleged breach of the implied covenant of good faith in establishing MAC reimbursement rates. Substantially similar claims were raised and rejected by the court in *Lakeview*. *Lakeview I*, 2015 WL 8331908, at *7. In light of the court's prior rejection of these claims, Counts III and IV of the second amended complaint will also be dismissed.

In Counts VI and VII of the second amended complaint, plaintiffs allege claims of breach of express contract. The plaintiffs do not challenge and therefore concede that, to the extent Counts VI and VII are based on the provision of the Provider Manual that states, in part, that "[o]ther nationally recognized referenced base price sources may also be implemented as market conditions warrant," the court has already ruled that it cannot serve as the basis for a breach of contract claim because the provision allows, but does not require, the defendant to use "other nationally recognized [price] sources. *See Lakeview II*, 2016 WL 3227258, at *5.

Plaintiffs allege that multiple MAC prices within the same plan are not permitted, even if defendant can set different MAC prices for different plans. While not citing to any explicit provision of the Provider Agreements or

Provider Manual requiring a single MAC price, plaintiffs cite to the provision of the Provider Manual which references the singular term "Maximum Allowable Cost" throughout and states "Providers . . . are reimbursed for prescription drugs at the lesser of the plan or network Average Wholesale Price (AWP) discount . . .; plus or minus a discount of Maximum Allowable Cost (MAC) (when applicable for prescription drug products . . .)" Plaintiffs note that this court held in *Lakeview* that "[c]onsidering the language cited by the plaintiff and the Provider Manual attached to the plaintiff's original complaint, the court cannot say that the language allows the defendant to set more than one MAC price." Because the claim here involves the same contract language, plaintiffs argue the result should be the same.

The defendant argues that plaintiffs' reliance on *Lakeview* is misplaced because the court did not have the Provider Agreement before it and did not therefore consider the terms of the Provider Agreement in deciding the motion to dismiss. In considering the defendant's argument, while the Provider Agreement states that different networks will be reimbursed at different rates, it still refers to MAC in the singular. Therefore, while defendant may be able to set different MAC prices for different plans, or

reimburse different networks at different rates, the court still cannot say that the language allows the defendant to use multiple MAC prices within the same plan. The defendant's motion to dismiss will be denied on this basis.

In these Counts, plaintiffs further argue that the defendant breached the Provider Agreement by paying pharmacies a generic MAC price while billing the Plan the brand price. Plaintiffs argue that neither the Provider Agreement nor the Provider Manual granted the defendant the discretion to do so. Relying on Schedule A and Section 4.4 ("Pay when Paid Provision") of the Provider Agreement plaintiffs argue that the defendant was required to pay plaintiffs the same amount it is paid by its customers. However, upon review, Schedule A reflects how network pharmacies will be reimbursed at different levels depending on whether they fill a prescription for a brand or generic drug and the network in which they are included. Moreover, the Pay when Paid provision of the Provider Agreement simply sets forth the when the defendant is required to pay the pharmacies. It does not set forth in any way the amount to be paid or a requirement for classification. The defendant's motion will be granted in this respect.

Counts X and XII of plaintiffs' second amended complaint allege claims under Virginia and Arkansas state MAC laws. The defendant argues that the Virginia Code is inapplicable because it addresses accident and sickness insurers, not pharmacy benefit managers, and it applies only to provider contracts between carriers and their intermediaries. See Va. Code Ann. §38.2-3407.15:3 (West). The defendant argues it is not an intermediary or a carrier. While plaintiffs respond that they have included an allegation in the second amended complaint that puts the defendant within the definition of an intermediary, they do nothing to address the statute's limited applicability to accident and sickness insurers. The defendant's motion will be granted as to this claim.

The defendant argues that the Arkansas Code is inapplicable because plaintiffs have not alleged that the Arkansas pharmacies are actively engaged in the same mail order pharmacy services that the defendant provides. *See* Ark. Code Ann. §17-92-507(d)(1)(West). Plaintiffs argue that the statute defines "pharmacy" and "pharmacist" and the definitions do not differentiate between mail order and other pharmacies.

The statute provides, in relevant part:

(d)(1) A pharmacy benefits manager shall not reimburse a pharmacy or pharmacist in the state an amount less than the amount that the pharmacy benefits manager reimburses a pharmacy benefits manager affiliate for providing the same pharmacist services.

Ark. Code Ann. §17-92-507 (West).

The statute further provides the following definitions:

(3) "Pharmacist" means a licensed pharmacist as defined in §17-92-101;

(4) "Pharmacist services" means products, goods, and services, or any combination of products, goods, and services, provided as a part of the practice of pharmacy as defined in §17-92-101;

(5) "Pharmacy" means the same as in §17-92-101

Ark. Code Ann. §17-92-507 (West).

The "Practice of pharmacy" is defined as the healthcare provider profession of:

(i)(a) Dispensing, selling, distributing, transferring possession of, vending, bartering, or, in accordance with rules adopted by the Arkansas State Board of Pharmacy, administering drugs, medicines, poisons, or chemicals that under the laws of the United States or the State of Arkansas may be sold or dispensed only on the prescription and order of a practitioner authorized by law to prescribe drugs, medicines, poisons, or chemicals.

(b) Except as limited by rules adopted by the Arkansas State Board of Pharmacy, a pharmacist has the ability to administer medications.

(c) Influenza vaccines and influenza immunizations may be administered to a person seven (7) years of age or older under a general written protocol.

(d) Vaccines and immunizations other than influenza vaccines and influenza immunizations may be administered to a person from seven (7) years of age to eighteen (18) years of age under a general written protocol and subject to reporting required under §20-15-1203 if written consent of the parent or legal guardian of the minor is obtained before the administration of the vaccine or immunization.

(e) Vaccines and immunizations other than influenza vaccines and influenza immunizations may be administered to a person eighteen (18) years of age or older under a general written protocol.

(f) Medications other than vaccines and immunizations may be administered to a person seven (7) years of age or older under a patient-specific order or prescription and subject to reporting of the administration to the prescribing physician.

(g) A general written protocol under subdivisions (17)(A)(i)(c) and (e) of this section and patient-specific orders or prescriptions under subdivisions (17)(A)(i)(d) and (f) of this section shall be from a physician licensed by the Arkansas State Medical Board and practicing in Arkansas or within fifty (50) miles of the Arkansas border.

(h) Under a statewide protocol, a pharmacist may initiate therapy and administer or dispense, or both, drugs that include Naloxone and nicotine replacement therapy products;

(ii) Placing, packing, pouring, or putting into a container for dispensing, sale, distribution, transfer of, possession of, vending, or bartering any drug, medicine, poison, or chemical that under the laws of the United States or the State of Arkansas may be sold or dispensed only on the prescription of a practitioner authorized by law to prescribe drugs, medicines, poisons, or chemicals;

(iii) Placing in or affixing upon any container described in subdivision (17)(A)(ii) of this section a label required to be placed upon drugs, medicines, poisons, or chemicals sold or dispensed upon prescription of a practitioner authorized by law to prescribe those drugs, medicines, poisons, or chemicals;

(iv) Preparing, typing, or writing labels to be placed in or affixed on any container described in subdivision (17)(A)(ii) of this section, which label is required to be placed upon drugs, medicines, poisons, or chemicals sold or dispensed upon prescription of a practitioner authorized by law to prescribe those drugs, medicines, poisons, or chemicals;

(v) Interpreting prescriptions for drugs, medicines, poisons, or chemicals issued by practitioners authorized by law to prescribe drugs, medicines, poisons, or chemicals that may be sold or dispensed only on prescription;

(vi) Selecting, taking from, and replacing upon shelves in the prescription department of a pharmacy or apothecary drugs, medicines, chemicals, or poisons that are required by the laws of the United States or the State of Arkansas to be sold or dispensed only on prescription of a practitioner authorized by law to prescribe them;

(vii) Compounding, mixing, preparing, or combining drugs, medicines, chemicals, or poisons that under the laws of the United States or the State of Arkansas may be sold or dispensed only on the prescription of a practitioner authorized by law to prescribe them;

(viii) Advising and providing information concerning utilization of drugs and devices and participation in drug utilization reviews;

(ix)(a) Performing a specific act of drug therapy management or disease state management delegated to a pharmacist for an individual patient based upon a written protocol or a patient care plan approved by a physician, who shall be licensed in this state under the Arkansas Medical Practices Act, §17-95-201 et seq., §17-95-301 et seq., and §17-95-401 et seq.

(b) Drug therapy management shall not include the selection of drug products not prescribed by the physician unless the drug products are either named in the physician-initiated protocol or the physician-approved patient care plan;

(x) Providing pharmacy care; and

(xi) Providing pharmacokinetic services.

Ark. Code Ann. §17-92-101 (West).

Plaintiffs admittedly have not alleged that the pharmacies located in Arkansas are engaged in the same pharmacist services as defendant or that the services provided in store by plaintiffs are the same as the mail order services as required to establish a claim under the Arkansas statute. The defendant's motion to dismiss will be granted.

Finally, defendant argues that, if the court grants its motion to compel arbitration, the remainder of the action should be dismissed for lack of jurisdiction because the remaining non-arbitrable plaintiffs cannot satisfy the numerosity or amount in controversy requirements for a mass action under 28 U.S.C. §1332(d)(11), which is the sole basis upon which the court is alleged to have subject matter jurisdiction. In light of the fact that the court is denying the defendant's motion to compel, this argument is moot.

An appropriate order shall issue.

s/ Malachy E. Mannion
**MALACHY E. MANNION**
**United States District Judge**

**DATE: May 28, 2021**
17-1102-03