## IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

---

| | | |
|---|---|---|
| ROBERT D. MABE, INC., d/b/a Ashville Apothecary and Circleville Apothecary, et al. | : | |
| | : | |
| | : | |
| Plaintiff, | : | Case No. 3:17-cv-01102 |
| | : | |
| vs. | : | Judge Mannion |
| | : | |
| OPTUM RX, | : | |
| | : | |
| Defendant. | : | |

---

### NON-ARBITRABLE PLAINTIFFS' AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT AND CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT THEREOF

Pursuant to Rule 56.1 of the Local Rules for the United States District Court for the Middle District of Pennsylvania, Non-Arbitrable Plaintiffs, by and through their attorneys Jacobs Law Group PC, hereby submit the following Concise Statement of Undisputed Material Facts in numbered paragraphs as to which Non-Arbitrable Plaintiffs contend there is no genuine issue to be tried and which entitle Plaintiffs to partial summary judgment.

### TABLE OF CONTENTS

I.   INTRODUCTION ...............................................3

II.   PROCEDURAL HISTORY .........................................3

III.   **Background of Health Insurance Plans, and Pharmacy Benefit Managers**...............................................6

1

**IV.   Claim Adjudication** ...................................................................9

**V.    Contractual Relationship Between the Parties** ...........................10

**VII.    The Provider Agreements Also Specify Defendant Must Reimburse Plaintiff on a Per Claim Basis Pursuant to a "Lesser of" Formula** .................18

**VIII.    The Definition of MAC and the Contracts Require Defendant to Maintain and Reimburse Pharmacies Participating in the Same Plan Pursuant to a Single Uniform Maximum Allowable Cost at Any Given Time**22

**IX.    The Provider Manuals Require Defendant to Utilize Wholesale Market Data to Set Each Individual MAC Price Used to Reimburse Plaintiffs** ..........25

   **A.    The 2013 and 2014 Catamaran Provider Manuals Require Each Individual MAC Price to be Market-Based** ....................................................26

   **B.    The 2015 Catamaran Provider Manual Requires Each Individual MAC Price to be Market-Based** ....................................................................30

   **C.    The 2016-2020 Optum Provider Manuals Require Each Individual MAC Price to be Market-Based** ....................................................................32

**X.    Defendant's Outlier Methodology Requires That Each Individual MAC Price Be at Or Above a Market-Based Acquisition Cost** ...................................35

   **1.    Defendant's Outlier Methodology** .................................................35

   **2.    Relevant Depositions of Defendant's Representatives and 30(b)(6) Designees** ...................................................................................39

   **a.    Mr. James Watson** ......................................................................39

   **b.    Mr. Matthew Vesledahl** ..............................................................41

   **c.    Mr. Joshua Garrett** ....................................................................42

   **3.    Sources Defendant Utilized in its Outlier Methodology to Set Market-Based MAC Prices Prior to 2015** ...................................................43

   **4.    Sources Defendant Utilized in its Outlier Methodology to Set Market-Based MAC Prices From 2015 to the Present** .................................44

**XI.    Defendant's Outlier Methodology Requires that Every MAC Price be Determined Individually, Not on an Aggregate Basis, and based on Contemporary Wholesale Pricing Sources for Each Specific Drug**.................46

**XII.   The State MAC Laws of Pennsylvania, Missouri and Illinois, Which are Incorporated Into Defendants' Provider Manuals, Require that Each MAC Price be Based on Wholesale Prices Available to Retail Pharmacies** 48

## I.   INTRODUCTION

Pursuant to F. R. Civ. P. 56, Non-Arbitrable Plaintiffs ("Plaintiffs"), move for Partial Summary Judgment on two issues:

1.   The Contracts require that Defendant pay  a single MAC price for the same drug under the same health insurance plan during the same relevant time frame to all participating providers; and

2.   The Contracts require that each individual MAC price be market-based, i.e. equal to or greater than the applicable benchmark wholesale price for that particular drug, and not on an aggregate basis on a conglomeration of MAC prices

## II.   PROCEDURAL HISTORY

2.       Plaintiffs are 430 corporations or limited liability companies that own or operate retail or long term-care independent pharmacies located in forty-two different states. *See* Plaintiffs' Second Amended Complaint (ECF. 36), ¶¶ 1-431;Defendant's Motion to Compel Arbitration and Dismiss Non-Arbitrable Claims (ECF. 43), p. 3.1

3.      Plaintiffs are among an estimated 23,000 independently owned (i.e. non-chain) pharmacies in the United States. ECF. 36, ¶ 437.

4.      Defendant OptumRx is a pharmacy benefits manager ("PBM") headquartered at 2300 Main St. Irvine, CA 92614. ECF. 36, ¶ 432; Defendant's Answer to Plaintiff's Second Amended Complaint (ECF. 249), ¶ 432.

5.      Defendant Optum is the successor in interest to Catamaran Corporation, through merger in July 2015. ECF. 36, ¶ 432; ECF. 249, ¶ 432; Declaration of Joseph Zavalishin (ECF. 26-1) ("Zavalishin Dec."), ¶ 3.

6.      On February 13, 2018, Plaintiffs filed a Second Amended Complaint against Defendant OptumRx alleging Defendant failed to set Maximum Allowable Cost ("MAC") prices it used to reimburse Plaintiffs in accordance with the contractual terms between the parties, among other claims. *See* ECF. 36, ¶¶ 431-32, 438-39, 555-574.

7.      Plaintiffs alleged a breach of the applicable Provider Agreements and Provider Manuals. Plaintiffs attached a true and correct excerpt of the 2013

---

[1] Plaintiff S&R Pharmacy, Inc. was voluntarily dismissed from this action pursuant to Rule 41(a) of the Federal Rules of Civil Procedure.

Catamaran Provider Manual to the Second Amended Complaint. ECF. 36, ¶¶ 555-574.

8.      Plaintiffs also alleged a continuing breach of the Provider Agreements and Provider Manual contracts, and Defendant's duties of good faith and fair dealing, from January 2012 through the present date. Thus, Plaintiffs asserted claims against Defendant OptumRx, as successor in interest to Catamaran Corporation, under the applicable and effective Provider Agreements and Provider Manuals from January 2012 through the present date. ECF. 36, ¶ 438;

9.      On March 18, 2018, Defendant OptumRx filed its Motion to Compel Arbitration and Dismiss Non-Arbitrable Claims, seeking to compel 422 of the 430 Plaintiffs to arbitrate their claims asserted in the Second Amended Complaint.

10.     Eight Plaintiffs were not subject to Defendant OptumRx's Motion to Compel Arbitration:  RX Shops, Inc., Kuler Drugs, LLC, Redner's Markets, Inc. (stores Redner's #20, 21, 22 and 23), Pine Street Pharmacy, and Wells Pharmacy.[2] *See* ECF 43, p. 1 n.1.

11.     On May 28, 2021, the Court denied Defendant OptumRx's Motion to Compel Arbitration as to all 422 Plaintiffs subject to the motion. ECF. 237; ECF. 238.

---

[2] For purposes of this Concise Statement of Undisputed Facts, "Plaintiffs" will henceforth refer to the eight Non-Arbitrable Plaintiffs who Defendant admitted are not subject to any agreement to arbitrate.

12.    The Court also denied in part Defendant's Motion to Dismiss Non-Arbitrable Claims with respect to Plaintiffs' breach of contract claims pertaining to MAC pricing. ECF. 237; ECF. 238.

13.    On July 12, 2021, Defendant Optum filed its Answer to Plaintiffs' Second Amended Complaint. ECF. 249.

## III.    Background of Health Insurance Plans, and Pharmacy Benefit Managers

14.    The United States pharmaceutical supply chain consists of: (1) drug manufacturers; (2) drug wholesale distributors; (3) pharmacies; (4) health insurance companies; (5) pharmacy benefit managers; and (6) the patient. Declaration of Mark R. Cuker Esq in Support of Plaintiffs' Motion for Partial Summary Judgment ("Cuker Dec")  Ex. A, Expert Report of 3 Axis Advisors ("3AA Report"), pp. 12-13; Cuker Dec. Ex. B, Expert Report of David Hyman ("Hyman Report"), p. 8.

15.    Manufacturers are the source of prescription drugs, and they distribute their products through drug wholesalers to pharmacies, such as plaintiffs. Cuker Dec. Ex. A, 3AA Report, p. 12.

16.    Health insurance companies ("Insurers") insure the vast majority of the United States population. Cuker Dec. Ex. A, 3AA Report, p. 13; ECF. 36, 442.

17.    Insurers typically offer their prescription drug benefit(s) in the form of a health insurance plan, such as commercial, self-insured, Medicare, and/or

Medicaid (hereinafter "Plan"). Cuker Dec. Ex. A,  3AA Report, p. 13; Ex. B, Hyman Report, p. 8

18.     PBMs like Defendant identify a particular "Plan" by a unique combination of identifiers: (1) the Bank Identification Number (BIN); and (2) Processor Control Number. Cuker Dec. Ex C, July 22, 2020 Deposition of Matthew Vesledahl, 41:22-24, 45:1-46:10 ("Vesledahl Dep."); Cuker Dec. Ex. D October 20, 2020 Deposition of Joshua Garrett ("Garrett Dep."), 182:4-6; 202:1-7l; Cuker Dec. Ex. U, Business Requirements Document, MAC Appeal Database v. 5.0 (hereinafter "MAC Manual"), MABE0002875; MABE0002878; MABE0002983.[3]

19.     Insurers typically outsource the management and administration of the pharmacy benefit in the Plans they maintain to PBMs. Cuker Dec. Ex. A, 3AA Report, p. 13.

20.     Defendant OptumRx is a PBM that operates nationally to provide prescription drug management and administrative services to Insurers and the Plans they offer. Zavalishin Dec., ¶ 2-3; Declaration of Matthew Vesledahl (ECF. 118-7) ("Vesledahl Dec."), ¶ 2.

21.     PBMs such as Defendant contract with Insurers to administer and manage the Insurer's Plan(s). ECF. 36, ¶ 441; ECF. 249, ¶ 441; Cuker Dec. Ex. A,

---

[3] When possible, page numbers refer to Bates Stamped numbers of documents produced by Defendant in discovery.

3AA Report, p. 13; Ex. E, Expert Report of Alex Brumaru "Brumaru Report"), p. 4; Ex. B Hyman Report, pp. 7-9; Vesledahl Dec., ¶¶ 5-8.

22.     PBMs are third party administrators and operate as an intermediary in each of the components of the supply chain for prescription drugs identified above. *See supra*, ¶ 14; Cuker Dec. Ex. A, 3AA Report, p. 13.

23.     Insurers delegate to PBMs such as Defendant the authority to determine what drugs will be covered by the Plan (i.e. the formulary) and also the amounts that a pharmacy provider such as Plaintiffs will be paid for dispensing prescription drugs to the Insurer's members ("Members"). Cuker Dec. Ex. A, 3AA Report, p. 13; ECF. 36, ¶ 458.

24.     With this authority, PBMs such as Defendant separately contract with pharmacies, such as Plaintiffs, to establish a network of providers to dispense prescription drugs to Members.  ECF. 36, ¶ 441; ECF. 249, ¶ 441; Cuker Dec. Ex. A, 3AA Report, p. 13; Ex. B, Hyman Report, pp. 7-8; Ex. E, Brumaru Report, p. 3.

25.     Inherent to the design of the United States prescription drug supply chain, pharmacy providers such as Plaintiffs as required to contract with PBMs such as Defendant to gain access to Members. Cuker Dec. Ex. A, 3AA Report, p. 14; ECF. 36, ¶ 442.

26.     In effect, Defendant is the gatekeeper to Plaintiffs' access to Members of Insurers enrolled in the Plans it manages. Cuker Dec. Ex. A,  3AA Report, p. 14; ECF. 36, ¶ 442.

## IV.    Claim Adjudication

27.      Since at least January 2012, and continuing through the present date, Defendant OptumRx has established Plaintiffs' reimbursement rates for prescription drugs dispensed to Members enrolled with Insurers who have their prescription drug benefit(s) managed by Defendant. ECF. 36, ¶ 438; Cuker Dec. Ex. E, Brumaru Report, p. 2-3; Ex. B, Hyman Report, p. 8; Ex. A3AA Report, p. 13.

28.     When a Plaintiff pharmacy dispenses a prescription to a Member, Plaintiff transmits the details of the transaction to the Defendant, including information identifying the Member, the Plan BIN and PCN, the prescription drug dispensed, and the pharmacy's usual and customary charge, among other information. Cuker Dec. Ex. A, 3AA Report, p. 14.

29.     Upon receiving the transaction from a Plaintiff pharmacy, Defendant approves the transaction and eventually transmits payment to the Plaintiff pharmacy. Cuker Dec. Ex. A, 3AA Report, p. 14.

30.     The process by which Defendant determines Plaintiffs' per claim reimbursement is referred to as "claim adjudication". Cuker Dec. Ex. E, Brumaru Report, p. 4; Ex. A, 3AA report, pp. 12-14.

31.    The terms under which Plaintiffs are to be paid by Defendant for each adjudicated claim are set forth in the contracts between the parties. ECF. 36, ¶¶ 463, 559, 561, 564-65, 567, 569; ECF. 249, ¶¶ 460, 463;

## V.    Contractual Relationship Between the Parties

32.    Pharmacies such as Plaintiffs either contract with Defendant directly, or through Pharmacy Services Administrative Organizations ("PSAOs"), which act as intermediaries between pharmacy providers and PBMs. ECF. 36, ¶ 448; ECF. 249, ¶¶ 448-49; Zavalishin Dec., ¶¶ 5-6.

33.    The contracts that form the relationship between Defendant and the Plaintiffs consist of two documents: (1) the applicable Provider Agreement; and (2) the 2013-2020 Provider Manuals (collectively, the "Contracts"). ECF. 36, ¶ 467; ECF. 249, ¶ 460; Zavalishin Dec., ¶¶ 5-6, Exs. P, S.

34.    The eight Non-Arbitrable Plaintiffs have a contractual relationship with Defendant that is not subject to any arbitration clause. *See* ECF 43, p. 1 n.1

35.    Redner's Market Inc. (and therefore Redner's #20, Redner's #21, Redner's #22, and Redner's #23) contracted with Defendant directly. *See* Cuker Dec. Ex. F, MABE0000334-41 (hereinafter the "Redner's Provider Agreement"); Zavalishin Dec., Ex. P.

36.    All of the Redner's Plaintiffs are part of a single corporate entity, Redner's Markets, Inc. ECF 36, ¶¶ 90-93.

10

37.    The Redner's Provider Agreement does not contain an arbitration clause. Cuker Dec. Ex. F, MABE0000334-41.

38.    Three of the Plaintiffs entered the relationship with Defendant via a Provider Agreement between Defendant and the PSAO TriNet: Stacy's, Hometown, and Med Depot. *See* Cuker Dec. Ex. G, MABE0000103-119 (hereinafter "TriNet Provider Agreement"); Zavalishin Dec., Ex. S.

39.    These three Plaintiffs did not sign the TriNet Provider Agreement, did not negotiate the TriNet Provider Agreement, and were precluded from seeing a copy of the TriNet Provider Agreement. *See* ECF 36, ¶¶ 450-51; *see also* Cuker Dec. Ex. H, Deposition of Kerri Tanner, pp. 19:7-13, 23:20-25, 31:5-12, 45:11-19; Ex. G, MABE0000103-119.

40.    The TriNet Provider Agreement does not contain an arbitration clause. Cuker Dec. Ex. G, MABE0000103-119.

41.    Defendant could not locate a Provider Agreement for Plaintiff Wells Pharmacy. *See* ECF 43, p. 1 n.1.[4]

42.    Defendant created Provider Manuals that establish and detail the method(s) and amount(s) Plaintiffs will be reimbursed for dispensing prescription drugs to Members in Plans managed by Defendant. *See* ECF 36, ¶¶ 455, 457; *see*

---

[4] Thus, for Plaintiff Wells, the Provider Manuals provide the only contractual terms between the parties and therefore govern the relationship it its entirety. *See infra*, ¶¶ 42-57.

*also* Cuker Dec. Exs. I-K (2013-2015 Catamaran Provider Manuals); Cuker Dec. Exs. L-P (2016-2020 OptumRx Provider Manuals).

43.     Defendant issued Provider Manuals at least annually. *Id.*

44.     The Catamaran Provider Manuals state: "In the event of a conflict between the Provider Agreement and Provider Manual, the Provider Manual shall prevail." ECF 36, ¶ 456; see also Cuker Dec. Ex. I-K, MABE0000792; MABE0000845;        MABE0000949;        MABE0000987;        MABE0001104; MABE0001227;        MABE0001350;        MABE0001474;        MABE0001596; MABE0001726;        MABE0001851;        MABE0002001;        MABE0002147; MABE0002283; MABE0002421; MABE0002561; MABE0002706; ECF. 36, ¶ 456; ECF. 249, ¶ 456.

45.     The Optum Provider Manuals state nearly identically: "In the event this [Provider Manual] and the [Provider] Agreement have conflicting language, the [Provider Manual] will supersede the [Provider] Agreement." Cuker Dec., Exs. L-P; 2016 Optum Provider Manual, p. 3; 2017 Optum Provider Manual, p. 3; 2018 Optum Provider Manual, p. 3; 2019 Optum Provider Manual, p. 3; 2020 Optum Provider Manual, p. 3; 2021 Optum Provider Manual, p. 3.

46.     Therefore, Plaintiffs' prescription drug claims adjudicated by Defendant in year 2013 are governed by the reimbursement terms of the 2013 Catamaran Provider Manual. Cuker Dec. Ex. I,  MABE0000788-974.

47.    Plaintiffs' prescription drug claims adjudicated by Defendant in year 2014 are governed by the reimbursement terms of the 2014 Catamaran Provider Manual. Cuker Dec. Ex. J, MABE0000975-1829.

48.    Plaintiffs' prescription drug claims adjudicated by Defendant in year 2015 are governed by the reimbursement terms of the 2015 Catamaran Provider Manual prior to July 23, 2015, the effective date of the Catamaran-Optum merger. Cuker Dec. Ex. K, MABE0001830-2834.

49.    Following the merger of July 2015 Catamaran with Optum, the 2016 Optum Provider Manual became the applicable Provider Manual and governed the reimbursement terms of Plaintiff's prescription drug claims submitted to Defendant beginning in 2016. Cuker Dec Exs. K, L.

50.    Plaintiffs' prescription drug claims adjudicated by Defendant in year 2016 are governed by the reimbursement terms of the 2016 Optum Provider Manual. Cuker Dec., Ex. L.

51.    Plaintiffs' prescription drug claims adjudicated by Defendant in year 2017 are governed by the reimbursement terms of the 2017 Optum Provider Manual. Cuker Dec., Ex. M.

52.    Plaintiffs' prescription drug claims adjudicated by Defendant in year 2018 are governed by the reimbursement terms of the 2018 Optum Provider Manual. Cuker Dec., Ex. N.

53.    Plaintiffs' prescription drug claims adjudicated by Defendant in year 2019 are governed by the reimbursement terms of the 2019 Optum Provider Manual. Cuker Dec., Ex. O.

54.    Plaintiffs' prescription drug claims adjudicated by Defendant in year 2020 are subject to the reimbursement terms of the 2020 Optum Provider Manual. Cuker Dec., Ex. P.

55.    To the extent relevant, Plaintiffs' prescription drug claims adjudicated by Defendant in years 2021 and later are subject to the reimbursement terms of the Optum Provider Manuals for those years.

56.    The Provider Manuals describe the terms of Defendant's prescription drug reimbursements for all pharmacies participating in Defendant's provider networks without distinguishing between a large chain pharmacy, a small independent pharmacy or any other type of pharmacy. *See* Cuker Dec. Exs. I-K MABE0000791-92; MABE0000844-46; MABE0000948-50; MABE0000986-987; MABE0001103-04; MABE0001226-27; MABE0001349-50; MABE0001472-73; MABE0001595-96; MABE0001726-27; MABE0001849-51; MABE0001999-2001; MABE0002146-47; MABE0002282-83; MABE0002419-21; MABE0002559-61; MABE0002704-06; Cuker Dec. Exs. L-P, 2016 Optum Provider Manual, p. 39-40; 2017 Optum Provider Manual, p. 44-45; 2018 Optum

Provider Manual, p. 42-43; 2019 Optum Provider Manual, p. 40-41; 2020 Optum

Provider Manual, p. 41-42; 2021 Optum Provider Manual, p. 45.

57. The Provider Manuals therefore apply to, and govern reimbursement

terms, for all pharmacy providers participating in Defendant's networks. Cuker Dec.

Ex. Q, July 27, 2020 Deposition of James Watson ("Watson II Dep."), p. 56:24-

57:13; *see also* Ex. C, July 22, 2021 Deposition of Matthew Vesledahl ("Vesledahl

Dep"), pp. 37:18-38:14.

## VI. The Provider Manuals Specify Defendant Must Reimburse Plaintiffs on a Per Claim Basis Pursuant to a "Lesser Of" Formula

58. The Provider Manuals specify that Plaintiffs (and all participating

pharmacy providers) are to be reimbursed by Defendant for each adjudicated claim

based on the "lesser of" several pricing benchmarks. *See infra,* ¶¶ 59-63.

59. The 2013-2014 Catamaran Provider Manuals describe the "lesser of"

formula Defendant must use to determine Plaintiffs' reimbursement for each

adjudicated prescription drug claim:

> **Claims submitted by Provider** for plans utilizing a Catamaran national network, plan, other network, or via electronic claims submission point of service adjudication system for retail prescription drug benefit management or prescription processing **are reimbursed for prescription drugs at the lesser of the plan or network Average Wholesale Price (AWP) discount or other referenced based pricing; plus or minus a discount or maximum allowable cost (MAC) (when applicable for prescription drug products); the Provider's submitted gross amount due, the Provider's Usual and Customary price (U&C) that would be given under the same circumstances if the member did not possess prescription benefit**

**coverage; or submitted ingredient cost, and the applicable plan or network dispensing fee including taxes if applicable.** AWP, and brand or generic medication classification, is determined by Catamaran in all cases. Catamaran shall utilize client or plan parameters, Medi-Span or other national source, and internal processes as a reference but not as the sole determinant of price.

Cuker Dec. Ex. I-J, MABE0000791-92; MABE0000844-46; Ex.J, MABE0000948-

50; MABE0000986-987; MABE0001103-04; MABE0001226-27; MABE0001349-

50; MABE0001472-73; MABE0001595-96; MABE0001726-27 (emphasis added);

*see also* ECF 36, ¶ 463.

     60.    The 2015 Catamaran Provider Manual provides in nearly identical part:

**Claims submitted by Provider** for Members using a Catamaran Network or Client-sponsored network, via the electronic claims submission system for retail prescription benefit management or prescription processing, **are reimbursed at the lesser of: the plan or network average wholesale price (AWP) discount or other referenced based pricing; plus or minus a discount or maximum allowable cost (MAC) (when applicable for prescription drug products); Provider's submitted gross amount due; Provider's usual and customary price (U&C) that would be given under the same circumstances if the Member did not possess prescription drug benefit coverage; or submitted ingredient cost; and the applicable plan or network dispensing fee, including taxes if applicable.**

Cuker Dec. Ex. K MABE00001849; MABE00001999; MABE00002146;

MABE00002282; MABE0002419; MABE00002559; MABE00002704 (emphasis

added).

     61.    Following the Optum-Catamaran merger in July of 2015, the Optum

Provider Manuals governed the contractual relationship between Plaintiffs and

Defendant (across all plans and networks) and the Catamaran Provider Manuals ceased to apply effective January 2016. Cuker Dec. Exs. K, L.

62.     As with the Catamaran Provider Manuals, the 2016-2020 Optum Provider Manuals provide for a "lesser of" reimbursement methodology for each adjudicated claim:

> **Claims submitted by Network Pharmacy Provider** for Members using an Administrator network or Client network via the POS System for retail prescription benefit management or Claim processing **are reimbursed at the lesser of the following: the Benefit Plan or network AWP discount or other referenced based pricing plus applicable dispensing fee; MAC (when applicable for Covered Prescription Services); Network Pharmacy Provider's Submitted Cost Amount; Network Pharmacy Provider's U&C which would be given under the same circumstances if the Member did not possess prescription benefit coverage; or the submitted ingredient cost.**

Cuker Dec. Exs. L-P, 2016 Optum Provider Manual, p. 39-40; 2017 Optum Provider Manual, p. 44-45; 2018 Optum Provider Manual, p. 42-43; 2019 Optum Provider Manual, p. 40-41; 2020 Optum Provider Manual, p. 41-42; 2021 Optum Provider Manual, p. 45.

63.     Thus, under the terms of Defendant's Provider Manuals in effect from 2013 through the present, Plaintiffs were entitled to be receive an ingredient cost reimbursement for each individual prescription drug claim adjudicated by Defendant based on the "lesser of" four pricing benchmarks: (1) the plan or network AWP

discount; (2) the MAC price; (3) the Plaintiffs' submitted cost amount; or (4) the Plaintiffs' U&C. *See supra*, ¶¶ 59-62.

64.    In each of the Provider Manuals, "MAC" is used in the singular, and there is no provision for paying different MAC prices to different pharmacy providers servicing the same Plan. Cuker Dec. Ex. I. J, MABE0000791-92; MABE0000844-46; MABE0000948-50; MABE0000986-987; MABE0001103-04; MABE0001226-27; MABE0001349-50; MABE0001472-73; MABE0001595-96; MABE0001726-27;   MABE00001849;   MABE00001999;   MABE00002146; MABE00002282; MABE0002419; MABE00002559; MABE00002704; Cuker Dec. Exs. L-P 2016 Optum Provider Manual, p. 39-40; 2017 Optum Provider Manual, p. 44-45; 2018 Optum Provider Manual, p. 42-43; 2019 Optum Provider Manual, p. 40-41; 2020 Optum Provider Manual, p. 41-42; 2021 Optum Provider Manual, p. 45.

## VII.  The Provider Agreements Also Specify Defendant Must Reimburse Plaintiff on a Per Claim Basis Pursuant to a "Lesser of" Formula

65.    To the extent they do not conflict with the Provider Manuals, the TriNet Provider Agreement and Redner's Provider Agreement describes additional terms detailing Defendant's prescription drug reimbursements for Plaintiffs (excluding Plaintiff Wells). *See* Cuker Dec, Exs. F and G, Zavalishin Dec., Exs. P, S MABE0000106, MABE0000110; MABE0000335, MABE0000341.

18



████████████████████████████████████ ▬

Cuker Dec. Ex. G, MABE0000110; MABE0000118.

70.     Therefore, Schedule A dictates that Plaintiffs Stacy's, Hometown, and Med Depot are entitled to be reimbursed based on the ████████████████████ ████████████████████████████ on each adjudicated claim. Cuker Dec. Ex. G, MABE0000110; MABE0000118.

71.     In addition, Schedule A dictates that Plaintiff's Stacy's, Hometown, and Med Depot are entitled to receive a ████████████████████████ ████████████████████ on each adjudicated claim.  Cuker Dec. Ex. G, MABE0000110; MABE0000118.

72.     Consistent with Schedule A having varying AWP discounts and varying dispensing fees depending on the Plan, the TriNet Provider Agreement states that ████████████████████████████ Cuker Dec. Ex. G, MABE0000106.

73.     Significantly, however, there is ***no variance*** across Plans with respect to Plaintiffs Stacy's, Hometown, and Med Depot's contractual entitlement to receive "MAC" (in the singular), for those claims where Defendant's MAC price is lower than the AWP discount applicable to that Plan ██████████████ Cuker Dec. Ex. G, MABE0000110; MABE0000118.

20

74.    The Redner's Provider Agreement is the operative Provider Agreement for Plaintiff's Redner's, Redner's #21, Redner's #22, Redner's #23 for the entirety of the relevant time period. Cuker Dec. Ex. F, Zavalishin Dec., ¶ 24; *Id.*, Ex. P.

75.    The Redner's Provider Agreement also states that for generic drugs, Plaintiffs Redner's, Redner's #21, Redner's #22, Redner's #23 are entitled to a reimbursement at the ████████████████████████████████ ████████████████████████ Cuker Dec. Ex. F, MABE0000341, MABE0000335 (emphasis added).

76.    The Redner's Provider Agreement dictates that the four Redner's Plaintiffs elected to participate in the following Plans, and are entitled to the following reimbursement for generic drugs:



Cuker Dec. Ex. F, MABE0000341; MABE0000335.

77.    As with the TriNet Provider Agreement, the Redner's Provider Agreement has varying AWP discounts and dispensing fees based on the Plan.

Significantly, however, there is **no variance** across Plans with respect to the Redner's Plaintiffs' entitlement to receive MAC (in the singular), for those claims where Defendant's MAC price is lower than the AWP discount applicable to that Plan (or the Plaintiff's submitted U&C, where applicable). Cuker Dec. Ex. H MABE0000341; MABE0000335.

78.     Therefore, pursuant to the terms of the TriNet Provider Agreement and Redner's Provider Agreement, Plaintiffs are entitled to receive a MAC reimbursement for generic drugs, on each individual adjudicated generic drug claim as their ingredient cost reimbursement where Defendant's MAC price is the "lesser of" the other benchmarks. *See supra,* ¶¶ 68-69, 73, 75-77; *see also* Cuker Dec. Ex. B Hyman Report, p. 16 (stating the 'lesser of' provisions of the contracts require Defendant to examine the "*individual claims* submitted by Plaintiffs or other pharmacies") (emphasis added).

## VIII.   The Definition of MAC and the Contracts Require Defendant to Maintain and Reimburse Pharmacies Participating in the Same Plan Pursuant to a Single Uniform Maximum Allowable Cost at Any Given Time

79.     MAC stands for "Maximum Allowable Cost". Cuker Dec. Ex. C Vesledahl Dep., 24:9-10; May 29, 2019; Ex. R, Deposition of Albert Thigpen ("Thigpen Dep."), 26:7-12; Ex. S, May 28, 2019 Deposition of Russell Annunziata ("Annunziata Dep."), 44:13-22; Ex. Q, Watson II, 71:15-17; Ex. U, MABE0002892.

80.    Each of Defendant's Provider Manuals during the time period in question further defined MAC to mean "Maximum Allowable Cost", in the singular. *See infra*, ¶¶ 81-82.

81.    MAC is defined to mean "the maximum allowable cost for pharmaceutical products" by each of the Catamaran Provider Manuals. Cuker Dec. Ex. I, J MABE0000792; MABE0000845; MABE0000949; MABE0000986; MABE0001103;       MABE0001127;       MABE0001349;       MABE0001472; MABE0001595;       MABE0001726;       MABE0001850;       MABE0002000; MABE00002146;     MABE00002282;     MABE0002419;     MABE00002559; MABE00002704.

82.    The Optum Provider Manuals similarly define MAC to mean "maximum allowable cost". Cuker Dec. Exs. L-P, 2016 Optum Provider Manual, p. 16; 2017 Optum Provider Manual, p. 17-18; 2018 Optum Provider Manual, p. 16; 2019 Optum Provider Manual, p. 16; 2020 Optum Provider Manual, p. 16; 2021 Optum Provider Manual, p. 17.

83.    Multiple dictionaries define "maximum" as the most or highest. *See, e.g.* https://www.merriam-webster.com/dictionary/maximum?src=search-dict-box (defining "maximum" as: (1) the greatest quantity or value attainable or attained; b **:** the period of highest, greatest, or utmost development; (2) an upper limit allowed (as by a legal authority) or allowable (as by the circumstances of a particular case);

23

(3) the largest of a set of numbers));

https://en.oxforddictionaries.com/definition/maximum (maximum means "great, high or intense as possible or permitted");

https://www.dictionary.com/browse/maximum (defining "maximum to be "the greatest quantity or amount possible, assignable, allowable, etc");

https://www.ahdictionary.com/word/search.html?q=maximum (defining "maximum" to mean: (1) The greatest possible quantity or degree; (2) The greatest quantity or degree reached or recorded; the upper limit of variation.[5]

84.     Therefore, Maximum Allowable Cost (MAC), as used in the Provider Agreement and Provider Manuals, means the maximum amount that Defendant will pay to any pharmacy for a given generic prescription drug at a particular time. Cuker Dec. Ex. S, Annunziata Dep., p. 44:11-45:3.

85.     Russell Annunziata is the signatory to the TriNet Provider Agreement and had the authority to bind Defendant to its terms. *Id*.  Annunziata Dep., p. 43:6-24.

86.     Annunziata testified that he understood "maximum allowable cost" to mean ████████████████████████████ *Id*. Annunziata Dep p. 44:13-45:3.

---

[5] Each last checked July 27, 2021.

87.     Albert Thigpen, who replaced Annunziata as Vice President of Supply Chain relations, also understood MAC to mean ███████████████████████████ ████████████████████████ Cuker Dec. Ex. R, Thigpen Dep p. 26:7-12.

88.     Notwithstanding the unambiguous meaning of the word "maximum', Defendant ██████████████████████████████████████████████ █████████████████████████████████ e.g. Cuker Dec. Ex. Q Watson Dep. II, p. 79:3-15. Defendant's MAC appeal database shows that ████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████ Cuker Dec., Ex. A, 3AA Report, p. 63-64

## IX.     The Provider Manuals Require Defendant to Utilize Wholesale Market Data to Set Each Individual MAC Price Used to Reimburse Plaintiffs

89.     Pursuant to the "lesser of" methodology described in the Provider Manuals and Provider Agreements, Optum may pay Plaintiffs a MAC reimbursement for generic drugs where the MAC price is lower than the AWP discount or U&C. *See supra*, ¶¶ 65, 78.

90.     The overwhelming majority of generic drug claims are adjudicated by Defendant at the MAC price benchmark (as opposed to the AWP discount of U&C benchmarks) because Defendant's MAC prices are consistently the lowest of the

available choices. Cuker Dec. Ex. T, May 20, 2016 Deposition of James Watson ("Watson I Dep."), p. 22-24.

91.    In fact, according to Defendant's Director of Industry Relations, who represented MAC pricing from 2013 through January of 2017, approximately 90% of Defendant's generic drug reimbursements were made to participating pharmacies paid at the "MAC" price (as opposed to the AWP discount or U&C). *Id*. Watson I Dep., 23:8-12.

92.    As detailed below, Defendant's Provider Manuals applicable at all times relevant specifically set forth require Defendant to base *each individual* MAC price on the national wholesale generic drug market prices available to retail pharmacies. *See supra*, ¶¶ 93, 97, 101-04, 108-09, 113-16.

### A. The 2013 and 2014 Catamaran Provider Manuals Require Each Individual MAC Price to be Market-Based

93.    The 2013 and 2014 Catamaran Provider Manuals state that, when setting Plaintiffs' reimbursements, including MAC-based reimbursements, Defendant "shall utilize client or plan parameters, Medispan or other national source, and internal processes as a reference but not as the sole determinant of price." Cuker Dec. Exs. I and J, MABE0000792; MABE0000845; MABE0000949; MABE0000986;    MABE0001103;    MABE0001127;    MABE0001349; MABE0001472; MABE0001595; MABE0001726.

94.     The terms "client or plan parameters" refer to Defendant's contracts with its Plan customers, and Defendant's obligations contained therein. *See, e.g.* Dkt. #86 in *Lakeview v. Catamaran*, Court opinion dated September 28, 2017 at 14-16 (finding payments made by health plans to Catamaran are relevant to show "plan parameters").

95.     The term "Medi-Span" refers to Medi-Span ████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ Cuker Dec. Ex. D, Garrett Dep., p. 214:4-7; Ex. C, Vesledahl Dep., p. 189:21-24; Ex. Q., Watson II Dep., p. 50:11-17.

96.     The term "national sources" refers ████████████████████ ████████████████████████████████.[6] Cuker Dec. Ex. T, Watson I Dep., 28:2-13; 29:9-19.

97.     The 2013-2014 Catamaran Provider Manuals also state that "[o]ther nationally recognized referenced based price sources may also be implemented as market conditions warrant or under the circumstances where AWP becomes obsolete."[7] Cuker Dec. Ex. I,J  MABE0000792; MABE0000845; MABE0000949;

---

[6] See Section X, *infra* (detailing the "national sources" Defendant has chosen to use from 2012 through the present).

[7] *See* Section X, *infra* (detailing the "nationally recognized referenced based price sources" Defendant has chosen to use from 2012 through the present).

MABE0000986;        MABE0001103;        MABE0001127;        MABE0001349;
MABE0001472; MABE0001595; MABE0001726.

98.    The term "internal processes" refers to Defendant's own procedures for
generating market-based MAC prices, based on a synthesis of the various inputs
described above.[8]

99.    Therefore, although not "determinant", individually, the terms of the
2013 and 2014 Catamaran Provider Manuals require that Defendant "utilize": (1)
the applicable "plan parameters"; (2) "Medispan or other national source"; and/or
(3) "internal processes" when setting each individual MAC price used to reimburse
Plaintiffs.  MABE0000792;  MABE0000845;  MABE0000949;  MABE0000986;
MABE0001103;        MABE0001127;        MABE0001349;        MABE0001472;
MABE0001595; MABE0001726.

100.    The 2013 and 2014 Catamaran Provider Manuals also provide a process
for pharmacy providers such as Plaintiffs to submit MAC appeals to Defendant.
Cuker  Dec.  Ex.  I,J  MABE0000807-808;  MABE0000859;  MABE0000963;
MABE0000986;        MABE0001103;        MABE0001227;        MABE0001350;
MABE0001473; MABE0001596; MABE0001726.

---

[8] *See* Section X, *infra*. for an in-depth description of Defendant's "internal
processes".

101.   Specifically, the 2013 and 2014 Catamaran Provider Manuals state that: "MAC pricing appeals should always be directed to Catamaran; appeal requests must be submitted on our current form available at www.catamaran.com/pharmacies.[9] All fields on the form are required; incomplete forms may not be acknowledged. Your most recent invoice for the NDC submitted on the claim must accompany the appeal form." Cuker Dec. Ex. I, MABE0000807-8; Ex. J, MABE0000859; MABE0000963; MABE0000986; MABE0001103; MABE0001227; MABE0001350; MABE0001473; MABE0001596; MABE0001726.

102.   Defendant's later PMs further require that "[a]ll MAC appeals must include adequate information to allow [Defendant] to analyze the MAC appeal" including the pharmacy's most recent invoice documenting the wholesale price paid for the drug being appealed. Cuker Dec. Ex. K, 2015 Catamaran Provider Manual MABE0001850. Optum continued this practice after the merger, requiring that "participating pharmacies must submit their actual acquisition cost … for each item being reviewed." Cuker Dec. Exc. L. 2016 Optum Provider Manual, p. 51.

---

[9] The 2013 Catamaran Provider Manual refers network pharmacies to www.informedRx.com/pharmacies to access the MAC appeal form. *See e.g.* MABE000807.

**B. The 2015 Catamaran Provider Manual Requires Each Individual MAC Price to be Market-Based**

103.   The 2015 Catamaran Provider Manual states as follows with respect to MAC pricing and reimbursement: "the MAC is developed by Catamaran based upon information provided by Medi-span, a national compendia, and may be amended from time to time at its sole discretion in accordance with applicable law." Cuker Dec. Ex. K MABE0001850; MABE0002000; MABE0002146; MABE0002282; MABE0002420; MABE0002560; MABE0002705; Cuker Dec., Ex. B, Hyman Report, p. 15.

104.   Furthermore, the 2015 Catamaran Provider Manuals expressly requires Defendant to set its MAC prices based on wholesale market data:

> "Catamaran determines MAC pricing based upon a review of: pricing information from a nationally recognized pricing service, one or more national drug wholesalers and/or manufacturers, and the publically [sic] available results of CMS' survey of retail prices.

Dec. Ex. K, MABE0001850; MABE0002000; MABE0002420; MABE0002560; MAB0002705;[10]

105.   The term "publically [sic] available results of CMS' survey of retail prices refers to ███████████████████████████████████████████████ ██████████████████████████████████████████████████ Cuker Dec.

---

[10] *See* Section X, *infra* (detailing the "pricing information from a nationally recognized pricing service" and the "national drug wholesalers and/or manufacturers" Defendant used to determine MAC pricing during the period in question.

Ex. T, Watson I Dep., 28:4-8; Ex. D, Garrett Dep., 214:1-9; *see also* Ex. C, Vesledahl Dep., 190:14-18.

106.   According to the 2015 Catamaran Provider Manual, each individual MAC price used to reimburse Plaintiffs must have basis in: (1) a nationally recognized pricing service; (2) one or more national drug wholesalers and/or manufacturers; and/or (3) the CMS's public surveys of retail prices.[11] Cuker Dec. Ex. K, MABE0001850; MABE0002000; MABE0002420; MABE0002560; MAB0002705.

107.   The 2015 Catamaran Provider Manual also provided for a process whereby pharmacy providers such as Plaintiffs could submit MAC appeals. *Id*., MABE0001850;   MABE0002000-01;   MABE0002146-47;   MABE0002282-83; MABE0002420-21; MABE0002560-61; MABE0002705-06.

108.   Specifically, the 2015 Catamaran Provider Manual states:

> In accordance with applicable state laws, Provider may appeal MAC pricing. The following appeals process will be generally applicable to MAC appeals. In general, MAC appeals, when permitted, should be directed to Catamaran and requests should be submitted on the current form that is available at www.catamaranrx.com/Pharmacies.

---

[11] The 2015 Catamaran Provider Manuals also state that "Catamaran reserves the right to updates its MAC pricing methodology and to use alternative, reputable sources at its discretion." MABE0001850. Plaintiff refers the Court to Section X, *infra* for a discussion of the sources Defendant deemed "reputable" to set MAC prices with during the relevant time period.

*Id*. MABE00001850; MABE0002000-01; MABE0002146-47; MABE0002282-83;

MABE0002420-21; MABE0002560-61; MABE0002705-06.

109.    The 2015 Catamaran Provider Manual further states:

> In accordance with certain state law(s), Catamaran has
> adopted this Section addressing the legal requirements for
> Maximum Allowable Cost Appeals. This section shall be
> considered a part of the Catamaran Provider Agreement
> by and between Catamaran and Provider (including all
> Amendments, Addenda, and Rate Exhibits) . . . . Provider
> agrees and understands that to the extent any state specific
> law, rule, or regulation differs or contradicts the terms set
> forth herein, Catamaran shall follow the state specific law,
> rule, or regulation."

*Id*. MABE0001850; MABE0002000; MABE0002146; MABE0002282;

MABE0002420; MABE0002560; MABE0002705.

110.    According to the 2015 Catamaran Provider Manual, if a pharmacy

provider's MAC appeal is successful, the MAC price will be adjusted for all

"similarly   situated   Providers   *Id*.   MABE00001850;   MABE0002000-01;

MABE0002146-47;  MABE0002282-83;  MABE0002420-21;  MABE0002560-61;

MABE0002705-06; ECF. 249, ¶ 250.

## C. The 2016-2020 Optum Provider Manuals Require Each Individual MAC Price to be Market-Based

111.    As a result of the July 2015 Catamaran-Optum merger, all prescription

drug claims adjudicated by Defendant beginning in 2016 were subject to the terms

and conditions of the 2016 Optum Provider Manual. Cuker Dec. Ex. L.

112.    As January 2016, the 2016 Optum Provider Manual superseded any and all prior versions of the Catamaran Provider Agreements. Cuker Dec. Ex. L 2016 Optum Provider Manual, Cuker Dec., Ex K.

113.    The 2016-2020 Optum Provider Manuals state that: "MAC for pharmaceutical products is developed by [Defendant] based upon information provided by MediSpan or any other national recognized pricing source selected by [Defendant] and may be amended from time-to-time at its sole discretion in accordance with applicable law." Cuker Dec. L-P 2016 Optum Provider Manual, p. 16; 2017 Optum Provider Manual, p. 17-18; 2018 Optum Provider Manual, p. 16; 2019 Optum Provider Manual, p. 16; 2020 Optum Provider Manual, p. 16; 2021 Optum Provider Manual, p. 17.

114.    The 2016-2020 Optum Provider Manuals further expressly dictate what Defendant is required to base its MAC prices on:

> [Defendant] determines MAC pricing based on a review of the following: pricing information from a nationally recognized pricing service, one or more national drug wholesalers and/or manufacturers, and the publicly available results of CMS' survey of retail prices.

Cuker Dec. Exs. L-P, 2016 Optum Provider Manual, p. 16; 2017 Optum Provider Manual, p. 17-18; 2018 Optum Provider Manual, p. 16; 2019 Optum Provider Manual, p. 16; 2020 Optum Provider Manual, p. 16; 2021 Optum Provider Manual, p. 17.

115.   The 2016-2020 Optum Provider Manuals further describe the "sources" Defendant used to set MAC prices "include de-identified market pricing benchmark data such as AWP and WAC, wholesaler information on market availability and pharmacy information from inquiries." Cuker Dec. Exs. L-P 2016 Optum Provider Manual, p. 50; 2017 Optum Provider Manual, p. 54; 2018 Optum Provider Manual, p. 52; 2019 Optum Provider Manual, p. 51; 2020 Optum Provider Manual, p. 52; 2021 Optum Provider Manual, p. 54.

116.   The 2016-2020 Optum Provider Manuals require Defendant to synthesize all of the above-named sources to "create a market based MAC price for Generic Drugs on the MAC list." Cuker Dec., Exs. L-P 2016 Optum Provider Manual, p. 50; 2017 Optum Provider Manual, p. 54; 2018 Optum Provider Manual, p. 52; 2019 Optum Provider Manual, p. 51; 2020 Optum Provider Manual, p. 52; 2021 Optum Provider Manual, p. 54.

117.   Thus, Defendant's Provider Manuals require that it determine MAC prices and establish reimbursement in accordance with the national wholesale marketplace for generic prescription drugs and take into account a reasonable pharmacy's acquisition costs. *See supra*, ¶¶ 99-116.

118.   The 2016-2020 Optum Provider Manuals require Defendant to update its MAC prices "at least every seven (7) calendar days" to account for fluctuations in national generic drug pricing. Cuker Dec., Exs. L-P 2016 Optum Provider

Manual, p. 50; 2017 Optum Provider Manual, p. 54; 2018 Optum Provider Manual, p. 52; 2019 Optum Provider Manual, p. 51; 2020 Optum Provider Manual, p. 52; 2021 Optum Provider Manual, p. 54.

**X.   Defendant's ███████████████ Requires That Each Individual MAC Price Be at Or Above a Market-Based Acquisition Cost**

119.   At all times material, Defendant had a uniform process for both setting MAC prices used to reimburse pharmacy providers such as Plaintiffs; and subsequently adjusting those MAC prices through adjudicating MAC appeals. In both circumstances, the initial setting of the price and prospective MAC appeal, Defendant adhered to the same process and methodology. *See infra*, ¶¶ 120-171.

120.   At all times material, Defendant set MAC prices and adjudicated MAC appeals pursuant to a defined and uniform ████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████ *See infra*, ¶¶ 121-131.

**1.**   ███████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████

122.   ████████████████████████████████████ ████████████████████████████████████████████

██████████████████████████████████

████  Cuker Dec. Ex. C, Vesledahl Dep., 99-101:3; Ex. T, Watson I Dep., 44:14-

21; Ex. Q, Watson II Dep., 28:17-19.

    123.   Mr. Watson described Defendant's formula for setting MAC prices:



Cuker Dec. Ex. T, Watson I Dep., at 44:14-21; *see also* Ex. Q, Watson II Dep., 28:17-19.[12]

    124.   Mr. Vesledahl corroborated Mr. Watson's testimony on this point.

Cuker Dec. Ex. C, Vesledahl Dep at 29-33. Specifically, he stated:



---

[12] For the purposes of this Concise Statement of Undisputed Facts, this formula for setting MAC prices shall henceforth be referred to as the "Outlier Process".

Cuker Dec. Ex. C, Vesledahl Dep., 29:20-30:11 (emphasis added). See also *id*. at

108:4-12 ████████████████████████████████████████████ emphasis

added).

125.   Mr. Vesledahl described the ████████████████████

████████████████████████████████████████████████████

█████████████████████ Cuker Dec. Ex. C, Vesledahl Dep., 53:15-18.

126.   Consistent with the testimony of Messrs. Watson and Vesledahl,

Defendant's own internal process document[13] provides that : ████████████

████████████████████████████████████████████████████

████████████████████ Cuker Dec. Ex. U, MABE0002872.

127.   Consistent with the ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████ *Id*. MABE0002882

128.   ████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████ *Id*. MABE0002882.

---

[13] Business Requirements Document MAC Appeals Database v. 5.0. (hereinafter "MAC Manual"). Cuker Dec. Ex. U MABE0002870-2902.



129. As described by three representatives of Defendant who were deposed—James Watson, Matt Vesledahl and Joshua Garrett—and as documented

in its own internal documents, Defendant adhered to this ████████████

███████████████. *See supra*, Section X.2.

130.  ████████████████████████████████

██████████████████████████ Cuker Dec. Ex. D, Garrett Dep.,

74:2-6.



2.  **Relevant Depositions of Defendant's Representatives and 30(b)(6) Designees**

a.  **Mr. James Watson**

132.   Mr. James Watson was deposed as Defendant's Rule 30(b)(6) designee on the topics of MAC pricing and MAC appeals, in the related matter *Alberts Pharmacy vs. Catamaran Corp.*[14] on May 20, 2016 ("Watson I Dep."). Cuker Dec. Ex. V.

133.   Mr. Watson was also deposed in connection with this case on July 27, 2020 ("Watson II Dep.") in connection with Defendant's MAC pricing. Cuker Dec Ex. Q.

---

[14] No. 3:15-00290-MEM, Middle District of Pennsylvania.

134.   Mr. Watson was employed by Optum as Director of Industry Relations from the date of the Catamaran-Optum merger to July of 2017. Cuker Dec. Exs. Q and T, Watson I Dep., 7:3-8; Watson II Dep., 10:3-4

135.   As Director of Industry Relations, Mr. Watson "represent[ed] MAC pricing and MAC appeals" and oversaw MAC pricing for Defendant Optum. Cuker Dec. Exs. Q, T, Watson I Dep., 7:9-12; Watson II Dep., 16:4-8.

136.   Mr. Watson previously held the position of Director of Industry Relations for Optum's predecessor, Catamaran Corporation, and had the same duties and responsibilities. Cuker Dec. Ex. T, Watson I Dep., 7:16-16-20.

137.   Mr. Watson was therefore the Director of Industry Relations for Defendant from September of 2014 to January of 2017. Cuker Dec. Exs. T and Q, Watson I Dep., 8:2-6; Watson II Dep., 10:3-4; 16:12.

138.   Accordingly, Mr. Watson was involved in Defendant's setting and managing of MAC prices from September 2014 through January 2017. *See supra*, ¶¶ 132-137.

139.    Cuker Dec. Ex. Q Watson II Dep. 33:7-13.

### b.  Mr. Matthew Vesledahl

140.  Plaintiffs  deposed  Mr.  Matthew  Vesledahl  on  July  22,  2020,  as

Defendant's  30(b0(6)  designee  on  the  topics  of  MAC  pricing  and  MAC  appeals

Cuker Dec. Ex. V

███████████████████████████████████████████████

████████████████████████

### c.  Mr. Joshua Garrett

147.   Mr. Joshua Garrett was deposed as Defendant's 30(b)(6) designee on

the topic of MAC appeals. Cuker Dec. Ex. V.

███████████████████████████████████████████████

█████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████

██████████████████████████████████████████████

███

██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████

152.   ███████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████ Cuker Dec. Ex. T Watson I Dep.,

44:15-21; Ex. C, Vesledahl Dep., 29:30:11; Ex. D Garrett Dep., 26:26-39:7

### 3. Sources Defendant Utilized ███████████████████ to Set Market-Based MAC Prices Prior to 2015

153.   As discussed above, Defendant's Provider Manuals prior to 2015 required that it "utilize": (1) the applicable "plan parameters"; (2) "Medispan or other national source"; and/or (3) "internal processes" when setting each individual MAC price used to reimburse Plaintiffs. *See supra*, ¶ 93, 99.

154.   The Defendant's Provider Manuals prior to 2015 also state that it may utilize "other nationally recognized referenced based price sources as market conditions warrant or under the circumstances where AWP becomes obsolete." *See supra*, ¶ 97.

155.   According to Mr. Watson, the "national sources" and "other nationally recognized referenced based price source[s]" Defendant utilized when setting MAC prices prior to 2015 included: ████████████████████████████████████

██████████████████████████████████████ Cuker Dec. Ex. T, Watson I Dep., at 51:7-13; 70:2-9.

156.   Other "national pricing sources" and "national recognized referenced based pricing sources" ████████████████████. Cuker Dec. Ex. T Watson I Dep., 44:15-21; Ex. D, Garrett Dep., at 34:17-24.

157. ██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████ Cuker Dec. Ex. T Watson I Dep., 72:1-11;

74:13-79:10; 81:10-84:11; 85:23-86:1. Ex. W, Ukaebu Dep., 72:12-75:6; 146:15-

147:18.[15]

158. ██████████████████████████████████

████████████████████████████████████████

███████████████████████████ Cuker Dec. Ex. T and

Q, Watson I Dep., 53:3-7; 54:15-16; 63:1-3; Watson II Dep., 24:2-9.

**4. Sources Defendant Utilized in its** ███████████ **to Set**
**Market-Based MAC Prices From 2015 to the Present**

159.   From 2015 through the present, Defendant utilized the same pricing

sources as inputs in its ██████████ to generate market-based MAC prices.

Those three inputs are: (1) the Cardinal wholesale price; (2) NADAC; and (3) PAC.

*See infra*, ¶¶ 154.

160. ██████████████████████████████████

██████████████ Cuker Dec. Ex. U, MABE0002870-2902

---

[15] Geraldine Ukaebu was a member of Watson's MAC price setting and MAC
Appeal team. Cuker Dec. Ex. W.

161.   As discussed above, Defendant's Provider Manuals effective from January 1, 2015 through the present require that it determine each individual MAC price used to reimburse Plaintiffs "based upon": (1) a nationally recognized pricing service; (2) one or more national drug wholesalers and/or manufacturers; and/or (3) the CMS's public surveys of retail prices. *See supra*, ¶¶ 103-104, 113-14.

162.   The "nationally recognized pricing service", "national drug wholesalers and/or manufacturers" and "CMS public surveys of retail prices" that Defendant used in its Outlier Methodology to set MAC prices from 2015 to the present include the following pricing inputs: ████████████████████████████

████████████████████████████████████████

████████████████   Cuker Dec. Ex. T, Watson Dep., at 51:7-13; 69:12-17; Ex. C, Vesledahl Dep., 30:14-31:1; 34-35:1-11; 36:5-7; Ex. D, Garrett Dep 26:5-9; Cuker Dec. Ex U, MABE0002880-2882.

163.   PAC (Predictive Acquisition Cost) is a proprietary algorithm for predicating the wholesale acquisition costs of drugs for independent pharmacies. PAC is created by Glassbox Analytics and marketed by Reed Elsevier. Cuker Dec. Ex. A, 3AA Report, p. 27

164.   ██████████████████████████████████████████. Cuker Dec. Ex. D, Garrett Dep., at 34:17-24.

165. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████ Cuker Dec. Ex. T, Watson Dep., at 53:3-

7; 54:15-16 Ex. Q, Watson II Dep., 24:2-9; Ex. C, Vesledahl Dep., 31-32; Ex. D,

Garrett Dep. at 26:17-27:13, 29:2-4.

166. ████████████████████████████████████

████████████████████████████████████████

████████████████████████ Cuker Dec. Ex. Q,. Watson

II., at 69:14-17; Ex. U, MABE0002872.

**XI.** **Defendant's ████████████ Requires that Every MAC Price**
**be Determined Individually, Not on an Aggregate Basis, and based**
**on Contemporary Wholesale Pricing Sources for Each Specific Drug**

167. Defendant sets MAC prices and adjudicates MAC appeals ████████

████████████████████████████████████████

████████████████████████████████████████

████ Cuker Dec. Ex. U, MABE0002870-2874; Ex. C, Vesledahl Dep., 29:20-30:11

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████ ; 80:12-20, 81:4-6, 86:19-25, 108:25-109:8



**XII.** **The State MAC Laws of Pennsylvania, Missouri and Illinois, Which are Incorporated Into Defendants' Provider Manuals, Require that Each MAC Price be Based on Wholesale Prices Available to Retail Pharmacies**

175.   The Optum Provider Manuals in place from 2016 through 2020 also require compliance with applicable state law:

> To comply with applicable state laws, [Defendant] has implemented an appeals process to allow a participating network pharmacy to dispute applicable and particular MAC pricing of a Covered Prescription Drug Service Product (i.e. MAC Appeal). This process also includes a timely review and investigation to resolve MAC disputes. . . . [Defendant] shall investigate and resolve the appeal within thirty (30) business days after the fully completed form is received.

Cuker Dec. Exs. L-P 2016 Optum Provider Manual, p. 50; 2017 Optum Provider Manual, p. 54; 2018 Optum Provider Manual, p. 52; 2019 Optum Provider Manual, p. 51; 2020 Optum Provider Manual, p. 52; 2021 Optum Provider Manual, p. 54.

176.   The Optum Provider Manuals further state that: Defendant "shall follow the state-specific law, rule or regulation", to the extent it contradicts the terms of the Provider Manual. Cuker Dec. Exs. L-P 2016 Optum Provider Manual, p. 50; 2017 Optum Provider Manual, p. 54; 2018 Optum Provider Manual, p. 52; 2019 Optum Provider Manual, p. 51; 2020 Optum Provider Manual, p. 52; 2021 Optum Provider Manual, p. 54.

177.   The MAC laws in Pennsylvania, Illinois and Missouri, applicable to Plaintiffs Redners, Stacy's, Hometown and  Med Depot, each require that MAC prices be based on wholesale prices available to retail pharmacies. 40 P.S. § 4533(b) (requiring PBM to and identify the national drug code of an equivalent drug that is available for purchase by network retail pharmacies in this Commonwealth from wholesalers at a price that is equal to or less than the maximum allowable cost); MO. Stat 376.388(6) (requiring PBM to "identify the national drug code of a drug product that may be purchased by contracted pharmacies at a price at or below the maximum allowable cost"); Il. ST. CH 215 Sec. 5/513(b)(1) (requiring the PBM to supply "the name and the national drug code number from national or regional wholesalers" supporting denial of MAC appeals).

Respectfully submitted,

JACOBS LAW GROUP, PC

Dated:  August 26, 2021

*/s/ Mark R. Cuker*
MARK R. CUKER
130 N. 18th Street, Suite 1200
Philadelphia, PA  19103
mcuker@jacobslawpc.com
(215)569-9701