**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ROBERT D. MABE, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>OPTUMRX,<br><br>Defendant. | CIVIL ACTION NO. 3:17-CV-01102<br><br>(MEHALCHICK, J.) |

**MEMORANDUM**

On June 22, 2017, 431 pharmacies initiated this action by filing a complaint against Defendant OptumRx. (Doc. 1). On July 22, 2024, the Court granted OptumRx's motion to compel arbitration regarding 423 of the Plaintiffs. (Doc. 410). However, the Court's arbitration decision does not apply to eight remaining Plaintiffs ("the remaining Plaintiffs") and the Court denied OptumRx's first motion for summary judgment regarding the remaining Plaintiffs. (Doc. 414). Before the Court is a renewed motion for summary judgment filed by OptumRx (Doc. 429), a motion for partial summary judgment filed by the remaining Plaintiffs. (Doc. 447), and OptumRx's motion to amend/correct its answer. (Doc. 432). For the following reasons, OptumRx's motion for summary judgment is **DENIED** and its motion to amend/correct is **GRANTED**. The remaining Plaintiffs' motion for summary judgment is **GRANTED in part** and **DENIED in part**.

## I. BACKGROUND AND PROCEDURAL HISTORY

The following background is taken from the parties' statements of material facts and responses thereto.[1] (Doc. 431; Doc. 449; Doc. 450; Doc. 462). OptumRx is a pharmacy benefit manager that manages and administers prescription drug benefit programs on behalf of health plans and insurance companies. (Doc. 431, ¶ 1; Doc. 449, ¶ 1). OptumRx is a successor to the Catamaran Corporation ("Catamaran"), a different pharmacy benefit manager OptumRx acquired in 2015. (Doc. 431, ¶ 2; Doc. 449, ¶ 2). The remaining Plaintiffs own and operate independent retail pharmacies and entered into agreements with OptumRx. (Doc. 431, ¶¶ 7-11; Doc. 449, ¶¶ 7-11; 450, ¶ 2; Doc. 462, ¶ 2).

When an independent pharmacy contracts with OptumRx, it usually has a pharmacy services administrative organization ("PSAO") act as agents of the pharmacy and sign the agreements on the pharmacy's behalf. (Doc. 431, ¶ 6; Doc. 449, ¶ 6). From 2010, to 2018, Plaintiffs Redner's Market, Inc, d/b/a Redner's Pharmacy, Redner's Market, Inc., d/b/a Redner's Pharmacy # 21, Redner's Market, Inc., d/b/a Redner's Pharmacy # 22 ("Redner's 22"), and Redner's Market, Inc., d/b/a Redner's Pharmacy # 23 ("Redner's 23") (collectively, "the Redner's Plaintiffs") contracted directly with Catamaran and OptumRx. (Doc. 431, ¶ 7; Doc. 449, ¶ 7). However, on February 2, 2018, the Redner's Plaintiffs joined Access Health, a PSAO, and through that relationship, the Redner's Plaintiffs became subject to OptumRx's Provider Agreement because Access Health signed it. (Doc. 431, ¶¶ 8-9; Doc. 449, ¶¶ 8-9). While the remaining Plaintiffs agree that the Redner's Plaintiffs became subject to Optum Rx's provider agreement through their relationship with Access Health, the remaining

[1] Pursuant to Local Rule 56.1, the Court accepts as true all undisputed material facts supported by the record. Where the record evinces a disputed fact, the Court will take notice. The facts have been taken in the light most favorable to the nonmoving party.

Plaintiffs contend that OptumRx never gave the Redner's Plaintiffs full access to an unredacted copy of the provider agreement, even after discovery in this case began. (Doc. 449, ¶ 9).

In 2013, Plaintiff Wells Pharmacy ("Wells") entered into a direct provider agreement with OptumRx before Wells closed in 2019. (Doc. 431, ¶ 10; Doc. 449, ¶ 10). Plaintiffs Stacy's Pharmacy ("Stacy's"), Hometown Pharmacy ("Hometown"), and Med Depot Pharmacy ("Med Depot") (collectively, "the TriNet Plaintiffs") contracted with OptumRx through TriNet, a PSAO, and became subject to OptumRx's provider agreement through TriNet. (Doc. 431, ¶ 11; Doc. 449, ¶ 11). While the remaining Plaintiffs agree that the TriNet Plaintiffs were subject to the provider agreement through TriNet, they assert that they never had the opportunity to read the agreement. (Doc. 449, ¶ 11).

The remaining Plaintiffs' provider agreements incorporated OptumRx's provider manuals. (Doc. 431, ¶ 12; Doc. 449, ¶ 12). The provider manuals apply to all pharmacies participating in OptumRx's networks and include policies and procedures pharmacies must comply with. (Doc. 431, ¶¶ 13-14; Doc. 449, ¶¶ 13-14). The provider manuals cover claim submission procedures, maximum allowable cost ("MAC") pricing, drug pricing appeals, claim dispute processes, audit procedures, and dispute resolution, amongst other provisions. (Doc. 431, ¶ 14; Doc. 449, ¶ 14). The provider manuals state that where there is a conflict between the provider agreement and the provider manual, the provider manual controls. (Doc. 431, ¶ 16, Doc. 449, ¶ 16). A version of the provider manual has been publicly available online since 2015. (Doc. 431, ¶ 18; Doc. 449, ¶ 18).

According to OptumRx, the provider manuals gave it complete discretion when setting MAC pricing, or the maximum allowable cost for pharmaceutical pricing, and that it had the

right to set MAC pricing differently for different providers. (Doc. 431, ¶¶ 19-31). The remaining Plaintiffs contend that while the provider manuals did give OptumRx discretion in setting MAC pricing, that discretion was not unlimited and OptumRx had to exercise that discretion "within the parameters of other contract language and its good faith and with fair dealing." (Doc. 449, ¶ 25). The remaining Plaintiffs further contend that the provider manuals did not give OptumRx the right to set different MAC prices for different pharmacies under the same reimbursement plan. (Doc. 449, ¶¶ 30-32).

According to OptumRx, when setting MAC pricing, OptumRx looks at the average wholesale price of generic drugs, national pricing data, and its own proprietary MAC pricing margin formula. (Doc. 431, ¶¶ 33-36). OptumRx contends that it needs to set different MAC prices for different pharmacies in order to achieve generic effective rates in the aggregate and that doing so is an industry practice. (Doc. 431, ¶¶ 40-41). The remaining Plaintiffs counter that there is no financial need for OptumRx to set different MAC pricing for different pharmacies, differential pricing is not an industry standard, and the provider manual prohibits such a practice. (Doc. 449, ¶ 40).

Pharmacies could appeal OptumRx's MAC pricing decisions. (Doc. 431, ¶ 42; Doc. 449, ¶ 42). According to OptumRx, the 2013 Catamaran provider manual allowed pharmacies to appeal MAC pricing decisions "within 45 days of the claim fill date." (Doc. 431, ¶ 43). OptumRx posits that beginning in 2014, however, OptumRx limited the time pharmacies had to appeal to thirty days. (Doc. 431, ¶ 44). OptumRx contends that the remaining Plaintiffs only submitted forty-three appeals and Redner's 22, Redner's 23, and Wells did not submit any appeals. (Doc. 431, ¶¶ 49-50). The remaining Plaintiffs counter that OptumRx's provider agreements and manuals only allowed pharmacies to submit appeals through their PSAOs

and that is why they were only able to submit a few appeals. (Doc. 449, ¶¶ 43-44, 49). The remaining Plaintiffs also contend that where a pharmacy succeeded on an appeal, OptumRx was required to adjust MAC pricing for all "similarly situated" pharmacies. (Doc. 450, ¶ 111). OptumRx counters that this is an oversimplification of the provider manuals' requirements. (Doc. 462, ¶ 111). Only Counts V and VII of the amended complaint remain in this action. (Doc. 36, ¶¶ 529-554, 572-74). In Count V, the remaining Plaintiffs allege that OptumRx is liable for breach of good faith and fair dealing for their handling of MAC pricing appeals. (Doc. 36, ¶¶ 529-554). In Count VII, the remaining Plaintiffs allege that OptumRx is liable for breach of contract as related to its handling of MAC pricing. (Doc. 36, ¶¶ 572-74).

## II. LEGAL STANDARDS

### A. SUMMARY JUDGMENT

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994). However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed

by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted." *See* M.D. Pa. L.R. 56.1.

A federal court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000). In deciding a motion for summary judgment, the court's function is not to make credibility determinations, weigh evidence, or draw inferences from the facts. *Anderson*, 477 U.S. at 249. Rather, the court must simply "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must go beyond the pleadings with affidavits or declarations, answers to interrogatories, or the like to demonstrate specific material facts which give rise to a genuine issue. Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324. The non-movant must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. Furthermore, mere conclusory allegations and self-serving testimony, whether made in the complaint or a sworn statement, cannot be used to obtain or avoid summary judgment when uncorroborated and contradicted by other evidence of record. *See Lujan v. Nat'l Wildlife*

*Fed'n*, 497 U.S. 871, 888 (1990); *see also Thomas v. Delaware State Univ.*, 626 F. App'x 384, 389 n.6 (3d Cir. 2015) (not precedential) ("[U]nsupported deposition testimony, which is contradicted by the record, is insufficient to defeat summary judgment."); *Nat'l Labor Rel. Bd. v. FES*, 301 F.3d 83, 95 (3d Cir. 2002) ("[The plaintiff's] testimony. . . amounts to an unsupported, conclusory assertion, which we have held is inadequate to satisfy the movant's burden of proof on summary judgment").

B. MOTION TO AMEND

Federal Rule of Civil Procedure 15(a)(1) permits amendment of a pleading as a matter of course. Rule 15(a)(1) provides:

> A party may amend its pleading once as a matter of course within:
>
> (A) 21 days after serving it, or
>
> (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.

Fed. R. Civ. P. 15(a)(1)

"In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The Court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).

## III. DISCUSSION

OptumRx contends that there is no evidence in the record from which a reasonable jury could conclude that it breached any contracts. (Doc. 430, at 16-21, 25-26). In response, the remaining Plaintiffs argue that OptumRx breached both its provider agreements and manuals and that they are entitled to two findings regarding the duties imposed by the provider agreements and provider manuals:

(1) The Contracts require that each individual MAC price be market-based, i.e. equal to or greater than the applicable benchmark wholesale price for that particular drug, and not on an aggregate basis on a conglomeration of MAC prices; and

(2) The Contracts require that Defendant maintain a single and uniform MAC price for the same drug under the same health insurance plan during the same relevant time frame for all participating providers.

(Doc. 448, at 9).

OptumRx next contends that there is no evidence from which a reasonable jury could conclude that it breached its duty of good faith and fair dealing, and even if a jury could conclude that OptumRx breached its contracts or duty of good faith and fair dealing, there is no evidence that such a breach caused the remaining Plaintiffs damages. (Doc. 430, at 21-25, 27-28, 31). According to OptumRx, if anything, the record shows that OptumRx's pricing methodology resulted in it over-reimbursing the remaining Plaintiffs for drugs, so it is also entitled to summary judgment on the affirmative defense of offset. (Doc. 430, at 31-33). Because OptumRx did not include an offset defense in its answer, it now moves to amend its answer. (Doc. 432).

The Court will first assess the duties imposed by the contracts between the parties and whether or not a reasonable jury could find that OptumRx breached a duty. The Court will then discuss whether a reasonable jury could determine that OptumRx breached its duty of good faith and fair dealing. The Court will then turn to whether any breaches of either an express or implied duty caused damages. Because OptumRx's offset defense relates to its damages arguments, the Court will then address whether OptumRx can amend its answer to include offset and the merits of the defense.

A. BREACH OF CONTRACT

In Count VII, the remaining Plaintiffs allege that OptumRx is liable for breach of express contract. (Doc. 36, ¶¶ 555-74). The remaining Plaintiffs allege that the provider agreement and provider manuals (together, the "Contracts") they signed with Catamaran and later OptumRx 1) require Catamaran/OptumRx to set the same MAC prices for the same drugs regardless of which pharmacy is selling them, so long as the pharmacies are on the same plan, 2) prohibit OptumRx from paying pharmacies less than each drugs' ingredient costs, and 3) require OptumRx to consider national pricing sources when setting MAC pricing. (Doc. 36, ¶¶ 559-63). OptumRx avers that it is entitled to summary judgment on Count VII because The remaining Plaintiffs cannot show that OptumRx breached the Contracts or that the remaining Plaintiffs suffered any damages because of an alleged breach. (Doc. 430, at 16). Regarding the alleged breach, OptumRx contends that the Contracts do not require OptumRx to set the same MAC prices for every pharmacy. (Doc. 430, at 17-21). The remaining Plaintiffs counter that not only is OptumRx not entitled to summary judgment on the issue of breach of contract, but that the remaining Plaintiffs are entitled to summary judgment on the question of whether the Contracts require OptumRx to offer one set MAC price to all pharmacies on the same plan. (Doc. 448, at 9).

The remaining Plaintiffs also aver that they are entitled to summary judgment on the proposition that "[t]he Contracts require that each individual MAC price be market-based, i.e.[,] equal to or greater than the applicable benchmark wholesale price for that particular drug, and not on an aggregate basis on a conglomeration of MAC prices." (Doc. 448, at 9). OptumRx responds that the remaining Plaintiffs cannot make this argument at this stage because they did not allege in the amended complaint that OptumRx breached the Contracts by departing from market-based pricing. (Doc. 430, at 25). OptumRx further counters that

even if the remaining Plaintiffs could make this argument, they did not breach the Contracts because OptumRx calculated MAC pricing in line with the methodology outlined in the Contracts. (Doc. 430, at 25-28).

The parties agree that Illinois law and California law apply to the remaining Plaintiffs' respective agreements and that both states' laws are substantively the same. (Doc. 430, at 16; Doc. 448, at 17-18). To survive summary judgment on a breach of contract claim, a plaintiff must present evidence from which a reasonable jury could conclude 1) an enforceable contract existed between the parties, 2) the plaintiff performed in accordance with the contract, 3) the defendant breached the contract, and 4) that breach caused the plaintiff damages. *See Swyear v. Fare Foods Corp.*, 911 F.3d 874, 886 (7th Cir. 2018) (applying Illinois law); *see also eOnline Glob., Inc. v. Google LLC*, 387 F. Supp. 3d 980, 985 (N.D. Cal. 2019) (applying California law).

When assessing the duties imposed by a contract and whether a party breached a duty, courts begin by reviewing the text of the contract and "construe contracts by giving their unambiguous terms clear and ordinary meaning, in an effort to determine the parties' intent. During [a court's] review, [the court does] not look at any one contract provision in isolation; instead, it read[s] the document as a whole." *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010), *as amended* (Dec. 16, 2010) (citations omitted) (applying Illinois law); *see also Thomas v. Cricket Wireless, LLC*, 506 F. Supp. 3d 891, 901 (N.D. Cal. 2020) (stating "[u]nder California law, '[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting.' The mutual intent of the parties is typically determined 'from the written terms [of the contract] alone'" (citations omitted)). Where a contract's terms are clear and unambiguous, contractual interpretation is a question of law appropriate for the Court to decide at summary judgment. *See Harmon v. Gordon*, 712

F.3d 1044, 1051 (7th Cir. 2013) (stating "[u]nder Illinois law, however, 'whether a contract is ambiguous is a question of law for the court'" and noting that a Court can determine the meaning of a contract where there is no dispute of fact and the contract is unambiguous (quoting *Shields Pork Plus, Inc. v. Swiss Valley Ag Serv.*, 329 Ill. App. 3d 305, 310 (2002)); *see also SDR Cap. Mgmt., Inc. v. Am. Int'l Specialty Lines Ins. Co.*, 320 F. Supp. 2d 1043, 1046 (S.D. Cal. 2004) (noting, under California Law, that "[i]f a contract is free from ambiguity, its meaning [is] a question of law to be determined by the court solely from its language. The determination as to whether a contract is or is not ambiguous is a question of law for the court" (citations and internal quotations omitted)). However, where a contract's terms are ambiguous and reasonable fact finders can disagree as to the parties' intent, questions of fact preclude summary judgment. *See Harmon*, 712 F.3d at 1051 (noting that under Illinois law "once contractual ambiguity is established, the task of interpreting the contract's meaning generally becomes a question of fact for the jury"); *see also Best Buy Stores, L.P. v. Manteca Lifestyle Ctr., LLC*, 859 F. Supp. 2d 1138, 1147 (E.D. Cal. 2012) (noting that under California law, "[w]hen a contract provision is ambiguous . . . 'ordinarily summary judgment is improper because differing views of the intent of parties will raise genuine issues of material fact'" (quoting *Maffei v. N. Ins. Co. of New York*, 12 F.3d 892, 898 (9th Cir. 1993)).

The parties dispute both the requirements of the Contracts and whether OptumRx caused damages by breaching the Contracts. The Court will first assess the parties' dueling assertions that the Contracts did/did not require OptumRx "maintain a single and uniform MAC price for the same drug under the same health insurance plan during the same relevant time frame for all participating providers." (Doc. 448, at 9). The Court will then evaluate

whether the remaining Plaintiffs are entitled to summary judgment on the issue of whether "each individual MAC price must be market-based." (Doc. 448, at 9).

**1. The Contracts required OptumRx to set a single MAC price which applied to all pharmacies on the same plan.**

The 2013 Catamaran Provider Manual, which applied to drug sales between 2013-2015,[2] provided the following:

> Claims submitted by Provider . . . are reimbursed for prescription drugs at the lesser of the plan or network Average Wholesale Price (AWP) discount or other referenced based on pricing; plus or minus a discount or maximum allowable cost (MAC) (when applicable for prescription drug products); the Provider's submitted gross amount due; the Provider's Usual and Customary price (U&C) that would be given under the same circumstances if the member did not possess prescription benefit coverage; or submitted ingredient cost; and the applicable plan or network dispensing fee including taxes if applicable.
>
> (Doc. 435-2, at 5-6).

The 2016 OptumRx Provider manual, which applied from 2016 to 2020,[3] contains the following terms:

> Claims submitted by Network Pharmacy Provider for Members . . . are reimbursed at the lesser of the following: the Benefit Plan or network AWP discount or other referenced based pricing plus applicable dispensing fee; MAC (when applicable for Covered Prescription Services); Network Pharmacy Provider's Submitted Cost Amount; Network Pharmacy Provider's U&C which would be given under the same circumstances if the Member did not possess prescription benefit coverage; or the submitted ingredient cost.
>
> (Doc. 435-9, at 40).

These agreements only require OptumRx to use MAC pricing where it results in reimbursements less than other pricing options such as pricing based on Average Wholesale

---

[2] Catamaran/OptumRx issued updated manuals in 2014 and 2015, but the parties agree that the updated manuals "include the same or substantially the same payment terms." (Doc. 431, ¶ 22; Doc. 449, ¶ 22).

[3] OptumRx also issued updated manuals from 2017 through 2020, but the parties agree that the updated manuals "contain similar payment terms." (Doc. 431, ¶ 24; Doc. 449, ¶ 24).

Price ("AWP"). (Doc. 435-2, at 5-6; Doc. 435-9, at 40). The Court denied the parties' last set of motions for summary judgment without prejudice because it was unclear to the Court whether OptumRx used MAC pricing when calculating reimbursements. (Doc. 413, at 14). The parties now agree that at least some claims were reimbursed with MAC pricing. (Doc. 431, ¶ 81; Doc. 449, ¶ 81). The parties disagree as to how OptumRx had to calculate MAC pricing and whether OptumRx's MAC pricing methodology led to OptumRx reimbursing the remaining Plaintiffs more or less than the remaining Plaintiffs' choice of methodology. (Doc. 430, at 17-25; Doc. 448, at 9, 40).

Regarding calculating reimbursements, all the relevant versions of the provider manual state that MAC pricing is developed and amended at Catamaran/OptumRx's "sole discretion." (Doc. 431, ¶ 25; Doc. 449, ¶ 25). The 2013 agreement states that "MAC means the maximum allowable cost for pharmaceutical products. The MAC (Maximum Allowable Cost) is developed by Catamaran and may be amended at any time at its sole discretion" and further states, regarding pricing determinations, "Catamaran shall utilize client or plan parameters, Medi-Span or other national source, and internal processes as a reference but not as the sole determinant of price." (Doc. 435-2, at 6). The 2014 and 2015 versions of the provider manuals stated the same. (Doc. 431, ¶¶ 22, 25; Doc. 449, ¶¶ 22, 25).

The 2016 through 2020 versions of the provider manual expanded the description of MAC pricing and stated the following:

> MAC for pharmaceutical products is developed by Administrator based upon information provided by Medi-Span or any other nationally recognized pricing source selected by Administrator and may be amended from time-to-time at its sole discretion in accordance with applicable law.
>
> Administrator determines MAC pricing based on a review of the following: pricing information from a nationally recognized pricing service, one or more national drug wholesalers and/or manufacturers, and the publicly available

> results of CMS' survey of retail prices. Administrator reserves the right to update its MAC pricing methodology and to use alternative, reputable sources at its discretion . . .
>
> To assure the MAC list accurately reflects market pricing and the availability of Generic Drugs, Administrator utilizes multiple sources to determine MAC pricing. The sources include de-identified market pricing benchmark data such as AWP and WAC, wholesaler information on market availability and pharmacy information from inquiries. A synthesis of these and other sources helps create a market based MAC price for Generic Drugs on the MAC list . . . Administrator reserves the right to update its MAC pricing methodology and to use alternative, reputable sources at its discretion.
>
> (Doc. 431, ¶ 26; Doc. 435-9, at 17; 51; Doc. 449, Doc. 431, ¶ 26).

The parties agree that OptumRx's MAC pricing for individual drugs varied from pharmacy to pharmacy even if the pharmacies were on the same Catamaran/OptumRx health plan. (Doc. 450, ¶ 89; Doc. 452-1, ¶ 89; Doc. 458, ¶ 89). The remaining Plaintiffs aver that "[t]he unambiguous meaning of 'maximum' in the term 'Maximum Allowable Cost' does not allow [OptumRx] to set a higher 'maximum' price for a large chain pharmacy (or any pharmacy) than the 'maximum' price it pays [the remaining] Plaintiffs for prescriptions to members of the same Plan." (Doc. 448, at 26). OptumRx counters that "Maximum Cost" does not necessarily imply one singular cost when read in the context of the Contracts as a whole. (Doc. 430, at 18-21).

While evaluating OptumRx's previous motion to dismiss, the previously presiding judge rejected OptumRx's argument that the provider manuals, when read in conjunction with the provider agreements, necessarily allowed for different MACs for different pharmacies under the same plan. (Doc. 237, at 15-16). He determined that the Contracts specified that Catamaran/OptumRx sets a maximum allowable cost with "cost" being singular. (Doc. 237, at 15-16) (stating "while the Provider Agreement states that different networks will be reimbursed at different rates, it still refers to MAC in the singular . . . the

court still cannot say that the language allows the defendant to use multiple MAC prices within the same plan"). The Court agrees with the conclusion.

OptumRx avers that it was permitted to set different MAC pricing for different pharmacies because when read as a whole, the contracts dictate that "that reimbursements will vary based on a range of factors, such as the member's health plan, as well as the PSAO or network through which a particular pharmacy is contracted." (Doc. 430, at 18). However, OptumRx mistakes provisions allowing it to set variable pricing for all forms of reimbursement calculations with the Contracts' definition of MAC pricing. The provider manuals list MAC pricing as only one means of setting reimbursements and provide that OptumRx sets its reimbursement rates based on the methodology that yields the lowest price. *See* (Doc. 435-2, at 5-6; Doc. 435-9, at 40) (all stating that reimbursements are set by choosing "the lesser of" the amount yielded through multiple methodologies, not all involving MAC pricing). Further, even when the Contracts allow OptumRx to utilize MAC pricing in setting reimbursements, MAC pricing is only part of the reimbursement calculus, not an independent determinant of reimbursement pricing. *See* (Doc. 435-2, at 5-6) (stating that Catamaran may set reimbursement based on "other referenced based on pricing; *plus or minus* a discount or maximum allowable cost (MAC), . . ." (emphasis added)); *see also* (Doc. 435-9, at 40) (stating that OptumRx may set reimbursement amounts based on "other referenced based pricing *plus* applicable dispensing fee; MAC (when applicable for Covered Prescription Services), . . ." (emphasis added)). Thus, although OptumRx reimbursement pricing in general may differ from pharmacy to pharmacy, that does not mean MAC pricing, which may or may not factor into OptumRx's calculation of reimbursement pricing, may be set at different amounts for different pharmacies. (Doc. 430, at 18).

Reviewing how the Contracts discuss and define MAC pricing specifically, the provider agreements state that one method by which Catamaran/OptumRx may set reimbursement amounts is by adding or subtracting a set "maximum allowable cost," singular. (Doc. 435-2, at 5-6; Doc. 435-9, at 40). As noted in the Court's decision on the motion to dismiss, "maximum cost," singular, implies one set price for a given generic drug. (Doc. 237, at 15-16); *see Montefiore Med. Ctr. v. Loc. 272 Welfare Fund*, No. 14-CV-10229, 2017 WL 1194704, at *4 (S.D.N.Y. Mar. 31, 2017), *aff'd*, 712 F. App'x 104 (2d Cir. 2018) (finding that "maximum amount," singular, implied a single maximum price and that reading the contract, as defendants insisted, to mean that the "maximum amount" could vary by region would involve the court impermissibly rewriting the contract). Defendants urge the Court not to read this provision in isolation. (Doc. 430, at 18). However, the Contracts as a whole support, not diminish, this conclusion. For example, while the Contracts give Catamaran/OptumRx discretion in setting the MAC pricing amount, the 2016 to 2020 provider agreements state that OptumRx is to create a MAC pricing "list" where it "determines MAC pricing based on a review of the following: pricing information from a nationally recognized pricing service, one or more national drug wholesalers and/or manufacturers, and the publicly available results of CMS' survey of retail prices." (Doc. 435-9, at 17; 51). These factors all involve national drug pricing trends, not regional differences between pharmacies and their markets. (Doc. 435-9, at 17; 51). While defining MAC pricing, OptumRx, the author of the Contracts, could have mentioned regional factors which can be considered but chose not to. (Doc. 435-9, at 17, 51). Further, the Contracts could have stated that OptumRx sets MAC pricing while calculating reimbursement prices rather than utilizing a MAC pricing list. If OptumRx calculated its MAC pricing each time it determined its reimbursement amount, it could have

used its discretion to set different MAC pricing for different pharmacies. However, the Contracts did not include such a provision and instead, the 2016 through 2020 manuals explicitly stated that OptumRx is to maintain an accurate "MAC list." (Doc. 435-9, at 51).

Additionally, the Contracts' incorporation of state laws governing MAC pricing appeals also supports the conclusion that MAC pricing must be consistent for each pharmacy under the same plan. As discussed *infra* Section III.B, the Contracts incorporate state laws governing MAC appeals by reference and state MAC pricing laws require that where a provider grants a pharmacy's MAC pricing appeal, the provider adjust other similarly situated pharmacies' MAC pricing. (Doc. 435-2, at 36; Doc. 450, ¶¶ 109-10, 176; Doc. 458, ¶¶ 109-10; 176); *see* 40 P.S. § 4533 (c) (stating "[i]f a [provider] grants an appeal, the [provider] shall make the price correction, permit the reporting pharmacy to reverse and rebill the appealed claim and make the price correction effective for all similarly situated pharmacies from the date of the approved appeal"). A requirement that OptumRx adjust the MAC pricing for all pharmacies impacted by an appellate MAC pricing decision is inconsistent with OptumRx's contention that it may set completely different MAC prices for different pharmacies on the same plan. Accordingly, the Contracts, read as a whole support, not contradict, Judge Mannion's previous conclusion that a maximum allowable cost, singular, represents a single cost for all pharmacies on a given plan. (Doc. 237, at 15-16); *see Lakeview Pharmacy of Racine, Inc. v. Catamaran Corp.*, No. CV 3:15-0290, 2016 WL 3227258, at *7 (M.D. Pa. June 13, 2016) (finding that "maximum allowable cost" implied a single amount in a separate action against Catamaran). The Court **GRANTS** the remaining Plaintiffs' motion for summary judgment on the issue of whether "[t]he Contracts require that [OptumRx] maintain a single and

uniform MAC price for the same drug under the same health insurance plan during the same relevant time frame for all participating providers." (Doc. 448, at 9).

**2. The remaining Plaintiffs' articulation of the Contracts' market-based pricing requirements does not accurately reflect the Contracts' requirements.**

The remaining Plaintiffs also assert that they are entitled to summary judgment on the issue of whether "each individual MAC price be market-based, i.e. equal to or greater than the applicable benchmark wholesale price for that particular drug, and not on an aggregate basis on a conglomeration of MAC prices."[4] (Doc. 448, at 18-22). However, based on the Court's review of the Contracts, MAC pricing is not based on a single factor such as wholesale market data. The 2013 through 2015 versions of the provider manual state that MAC pricing is developed at Catamaran/OptumRx's discretion and that when determining pricing generally, Catamaran/OptumRx must consider certain national pricing metrics "as reference but not as the sole determinant of price." (Doc. 431, ¶¶ 22, 25; Doc. 435-2, at 6; Doc. 449, ¶¶ 22, 25). The 2016 through 2020 versions of the provider manual provide that MAC pricing must "accurately reflects market pricing and the availability of Generic Drugs" but also that OptumRx must use "multiple sources to determine MAC pricing." (Doc. 431, ¶ 26; Doc. 435-9, at 17; 51; Doc. 449, Doc. 431, ¶ 26). Thus, while the Contracts require OptumRx to consider data regarding national pricing trends and that OptumRx base its MAC pricing on its overall evaluation of the national market, the Court cannot grant Remaining Plaintiffs'

---

[4] The Court notes that OptumRx avers that the remaining Plaintiffs may not argue that OptumRx breached the Contracts by not basing MAC pricing on market data because they did not allege such a breach in the amended complaint. (Doc. 430, at 25). However, in the operative amended complaint, the remaining Plaintiffs allege that OptumRx breached the Contracts by not "implement[ing] 'other nationally recognized referenced base price sources as market conditions warrant.'" (Doc. 36, ¶ 560). This allegation is incorporated into Count VII, the remaining Plaintiffs breach of contract claim against OptumRx. (Doc. 36, ¶ 572).

motion for summary judgment on this issue because it is too specific and implies that OptumRx's contractual obligations restrict it to basing its decision on a particular measure of the market.[5] (Doc. 431, ¶¶ 22, 25-26; Doc. 435-2, at 6; Doc. 435-9, at 17; 51; Doc. 449, Doc. 431, ¶¶ 22, 25-26). The Court **DENIES** the remaining Plaintiffs' motion for summary judgment on whether "[t]he Contracts require that each individual MAC price be market-based, *i.e.* equal to or greater than the applicable benchmark wholesale price for that particular drug, and not on an aggregate basis on a conglomeration of MAC prices" but notes that OptumRx does have a contractual obligation to tie MAC pricing to market prices. (Doc. 448, at 9). As discussed *infra* Section III.B, use of discretion implicates the implied duties of good faith and fair dealing, and thus, the Court must turn to Count V of the operative amended complaint.

B. <u>IMPLIED WARRANTY OF GOOD FAITH AND FAIR DEALING</u>

In Count V, the remaining Plaintiffs allege that OptumRx breached the implied warranty of good faith and fair dealing by exercising their discretion over MAC pricing appeals in bad faith. (Doc. 36, ¶¶ 529-54). OptumRx contends that the remaining Plaintiffs hardly filed any MAC pricing appeals and where they did, "(1) there is no evidence that OptumRx failed to consider any acquisition cost information submitted by Plaintiffs and (2) there is no evidence that OptumRx failed to make retroactive adjustments on any successful appeals." (Doc. 430, at 30). The remaining Plaintiffs reply that there is a genuine dispute of

[5] The remaining Plaintiffs also argue that the Contracts incorporate state MAC laws, and the relevant state laws require that "each and every MAC price be based on wholesale prices available to retail pharmacies." (Doc. 448, at 22-23). However, the cited state laws only require providers to allow sufficient process for pharmacies to appeal MAC pricing determinations and do not require initial MAC pricing determinations to be based on a specific methodology. (Doc. 448, at 22-23) (citing 40 P.S. § 4533; V.A.M.S. § 376.388 (6); Il. ST. CH 215 Sec. 5/513(b)(1)(D); CO. Stat. § 25-37-103.5 (d)).

material fact precluding summary judgment because under the Contracts, OptumRx was required to apply successful appeal price changes to all applicable pharmacies, and a reasonable jury could conclude that OptumRx exercised its discretion over appeals in bad faith. (Doc. 452, at 38-40). According to the remaining Plaintiffs, a reasonable jury could find bad faith based on evidence that 1) OptumRx denied virtually all appeals and 2) even when it did grant appeals, OptumRx did not adequately tie MAC pricing to market pricing, ignored pharmacies' supply costs, and cost the remaining Plaintiffs millions by erroneously denying appeals that would have changed the remaining Plaintiffs' MAC pricing if granted. (Doc. 452, at 38-40).

Both Illinois and California courts recognize that "every contract implies good faith and fair dealing between the parties to it." *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443 (7th Cir. 1992) (applying Illinois law); *see Carma Devs. (Cal.), Inc. v. Marathon Dev. California, Inc.*, 2 Cal. 4th 342, 371 (1992) (applying California law). While the implied duty of good faith and fair dealing is not by itself an independent cause of action, it does allow a party to sue for breach of contract where a contract gives a defendant discretionary powers and the defendant exercises those powers in bad faith. *See Beraha*, 956 F.2d at 1443 (noting that "under Illinois law, the covenant of good faith and fair dealing has never been an independent source of duties for the parties to a contract" but also that "the implied covenant of good faith limits the controlling party's discretion and the controlling party must exercise that discretion reasonably and with proper motive, and may not do so arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." (citations and internal quotations omitted)); *see also Best Buy Stores*, 859 F. Supp. 2d at 1152 (stating that "California courts have noted that '[t]he covenant of good faith finds particular application in

situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith'" (quoting *Carma Devs. (Cal.), Inc.*, 2 Cal. 4th at 372)). Genuine disputes of material fact preclude summary judgment where a reasonable jury could determine that a defendant exercised their discretion in an objectively unreasonable way. *See Best Buy Stores, L.P.*, 859 F. Supp. 2d at 1154 (denying summary judgment while applying California law because a reasonable jury could conclude that a defendant exercised the discretion afforded to them by a contract in an objectively unreasonable way); *see also Beraha*, 956 F.2d at 1445 (finding, under Illinois law, that a district court erred by granting a defendant summary because the plaintiff presented a genuine dispute of material fact regarding whether a defendant exercised its discretion under a contract "in a manner consistent with the reasonable expectations of the parties").

As an initial matter, OptumRx avers that the remaining Plaintiffs cannot argue that OptumRx acted in bad faith when denying appeals because the remaining Plaintiffs themselves barely submitted any appeals. However, the Contracts incorporate relevant state laws regarding MAC appeals processes which require OptumRx to apply price corrections from successful appeals to all similarly situated pharmacies. (Doc. 435-2, at 36; Doc. 450, ¶¶ 109-10, 176; Doc. 458, ¶¶ 109-10; 176); *see* 40 P.S. § 4533 (c) (stating "[i]f a [provider] grants an appeal, the [provider] shall make the price correction, permit the reporting pharmacy to reverse and rebill the appealed claim and make the price correction effective for all similarly situated pharmacies from the date of the approved appeal"). Thus, even if the remaining Plaintiffs themselves did not submit an appeal, under the Contracts, they would benefit from

an appeal being granted because it would change the MAC pricing used to calculate their reimbursements.[6]

Turning to whether there is a genuine dispute of material fact regarding whether OptumRx acted in bad faith, as discussed *supra* Section III.A.2, MAC pricing must be market-based, but OptumRx retains wide discretion in setting it. Under both Illinois and California law, OptumRx has an implied duty to act in good faith when exercising its discretion to set and reevaluate MAC pricing. *See Best Buy Stores, L.P.*, 859 F. Supp. 2d at 1154; *see also Beraha*, 956 F.2d at 1445. To establish a breach of that duty, the remaining Plaintiffs must present evidence from which a reasonable jury could conclude that OptumRx acted unreasonably when exercising that discretion. *See Best Buy Stores, L.P.*, 859 F. Supp. 2d at 1154; *see also Beraha*, 956 F.2d at 1445. The Court finds that there is a genuine dispute of material fact regarding whether OptumRx breached its duty of good faith and fair dealing.

The remaining Plaintiffs present the expert report of Benjamin Link ("Link"), whose testimony OptumRx does not move to exclude, who analyzed a database of over seven million MAC appeals and determined that OptumRx almost never granted MAC appeals,

---

[6] The Court notes that OptumRx states that the remaining Plaintiffs "withdrew their claims relevant" to the Contracts' requirements that OptumRx make successful MAC pricing appeals retroactive. (Doc. 462, ¶ 111). The remaining Plaintiffs' concession is not as broad as this statement implies. The remaining Plaintiffs withdrew "any claim for damages due to a failure to make successful MAC appeals retroactive." (Doc. 449, ¶ 54). This means that the remaining Plaintiffs are no longer arguing that OptumRx breached its duty to apply successful appeals retroactively, but it does not mean that the Contracts' requirement that successful appeals be applied to similarly situated pharmacies is irrelevant to the remaining Plaintiffs' arguments. The remaining Plaintiffs argument is not that OptumRx failed to make appeals retroactive. Rather, the remaining Plaintiffs' argument is that OptumRx acted in bad faith when assessing appeals and because the Contracts required OptumRx to adjust MAC pricing for similarly situated pharmacies where an appeal succeeded, OptumRx's failure to act in good faith impacted the reimbursements they received because successful MAC appeals would have changed their MAC pricing. (Doc. 452, at 38-40; Doc. 461, at 11-12).

and where it did it typically only increased MAC pricing by a matter of cents. (Doc. 452-3, at 63-64). Link further concluded that MAC pricing set in the first instance, reaffirmed on appeal, and even changed upon appeal did not accurately reflect market considerations which OptumRx was required to base its discretionary MAC pricing decisions on. (Doc. 452-3, at 63-68). The remaining Plaintiffs also present testimony from James Watson ("Watson"), OptumRx's former Director of Industry Relations, in which Watson stated that when evaluating a MAC pricing appeal, Catamaran/OptumRx did not consider pharmacies' supply and component costs even though Catamaran previously asked for information regarding an appealing pharmacy's costs. (Doc. 452-14, at 24). Looking at the record and making all inferences in favor of the remaining Plaintiffs, a reasonable jury could conclude that the remaining Plaintiffs had a reasonable expectation that under the Contracts, OptumRx would not abuse its discretion by 1) denying almost all appeals, 2) ignoring market data when setting and reevaluating MAC pricing, and 3) asking for information implying that it would consider a pharmacy's costs but then ignoring that data. (Doc. 452-3, at 63-68; Doc. 452-14, at 24). Whether OptumRx's use of its discretion when evaluating MAC pricing and appeals was unreasonable is ultimately a question of fact, not law, and is thus inappropriate for summary judgment. *See Best Buy Stores, L.P.*, 859 F. Supp. 2d at 1154 (finding that a jury should determine whether a defendant's use of discretion was unreasonable); *see also Beraha*, 956 F.2d at 1445 (finding the same). Accordingly, OptumRx's motion for summary judgment on the issue of whether Defendants breached duties imposed by an express contract or the duty of good faith and fair dealing is **DENIED**. (Doc. 429).

C. DAMAGES

Having assessed the Contracts' requirements, the Court must turn to whether OptumRx caused the remaining Plaintiffs damages by breaching the Contracts and the duty of good faith and fair dealing. As discussed *supra* Section III.A.1, the Contracts required OptumRx to set a single MAC price per drug for pharmacies under the same plan. Further, although the Court cannot grant the remaining Plaintiffs' motion for summary judgment on their market-based theory, the Court notes, as discussed *supra* Section III.A.2 and *supra* Section III.B, that under the Contracts, MAC pricing must be tied to market pricing and a reasonable jury could conclude that OptumRx breached its implied duties of good faith and fair dealing by ignoring such information when evaluating MAC pricing appeals.

Regarding OptumRx's alleged breach of contract for setting different MAC pricing, OptumRx admits that it set different MAC pricing for different pharmacies but argues 1) the remaining Plaintiffs present no evidence that this caused them damages and 2) if anything, the record shows that OptumRx's MAC pricing methodology led to the remaining Plaintiffs being over-reimbursed for drugs. (Doc. 430, at 21-25; Doc. 450, ¶ 89; Doc. 452-1, ¶ 89; Doc. 458, ¶ 89). Regarding OptumRx's alleged breach of good faith and fair dealing, OptumRx contends that the remaining Plaintiffs present no evidence from which a reasonable jury could conclude that OptumRx's handling of appeals caused them financial damages. (Doc. 430, at 31).

Under both Illinois and California law, to survive summary judgment on a breach of contract claim,[7] a plaintiff must present evidence that they suffered actual damages from a

[7] Under both Illinois and California law, a breach of good faith and fair dealing involves the same damage requirement as a breach of contract claim because it is not a separate cause of action, but rather, an implied term in every contract, so a breach of good faith and fair dealing is, essentially, a breach of contract. *See Beraha*, 956 F.2d at 1443 (noting that "under

breach of contract. *See TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 631 (7th Cir. 2007) (stating "[m]erely showing that a contract has been breached without demonstrating actual damage does not suffice, under Illinois law, to state a claim for breach of contract"); *see also Aguilera v. Pirelli Armstrong Tire Corp.*, 223 F.3d 1010, 1015 (9th Cir. 2000) (stating "[u]nder California law, a breach of contract claim requires a showing of appreciable and actual damage"). However, a plaintiff is not required to prove a specific amount of damages so long as the plaintiff presents evidence from which a reasonable jury could calculate damages. *See TAS Distrib. Co.*, 491 F.3d at 631 (stating "under Illinois law, it is necessary to show damages—not the specific amount, but rather that the plaintiff did, in fact, suffer some damages"); *see also Acree v. Gen. Motors Acceptance Corp.*, 92 Cal. App. 4th 385, 398 (2001) (noting under California law that "[w]here the *fact* of damages is certain, as here, the *amount* of damages need not be calculated with absolute certainty").

The Court finds that the remaining Plaintiffs present sufficient evidence to create a genuine dispute of material fact regarding whether OptumRx's alleged breach of contract and breach of good faith and fair dealing caused damages. Beginning with Plaintiffs' breach of contract claim, the remaining Plaintiffs present Watson's testimony in which he testified that OptumRx used different formulas to calculate MAC pricing for different pharmacies which, at least in some instances, led to large pharmacies such as CVS having higher MAC prices

---

Illinois law, the covenant of good faith and fair dealing has never been an independent source of duties for the parties to a contract . . . Instead, the covenant guides the construction of explicit terms in an agreement"); *see also Boland, Inc. v. Rolf C. Hagen (USA) Corp.*, 685 F. Supp. 2d 1094, 1101 (E.D. Cal. 2010) (noting, under California law, that a breach of good faith and fair dealing "requires the same elements [as breach of contract], except that instead of showing that defendant breached a contractual duty, the plaintiff must show, in essence, that defendant deprived the plaintiff of a benefit conferred by the contract in violation of the parties' expectations at the time of contracting").

than small independent pharmacies such as the remaining Plaintiffs. (Doc. 452-10, at 11-14). The remaining Plaintiffs concede that they cannot prove that they suffered a precise number of damages. (Doc. 448, at 58). However, the remaining Plaintiffs are not required to prove a specific number of damages; rather, they need only present evidence from which a reasonable jury could conclude that they suffered calculable damages. *See TAS Distrib. Co.*, 491 F.3d at 631; *see also Acree*, 92 Cal. App. 4th at 398. The remaining Plaintiffs present Link's report which compared MAC pricing used to calculate the remaining Plaintiffs' reimbursements for a given drug on a set date with the highest amount another pharmacy was paid using MAC pricing for that same drug on that same date. (Doc. 452-17, at 30-35). Link evaluated the data using different sets of mathematical assumptions and various market pricing metrics and concluded that the remaining Plaintiffs suffered "underpayments on claims rang[ing] from $56,832.34 to $355,363.03." (Doc. 452-17, at 6-35).

Defendants aver that Link's testimony does not create a genuine dispute of material fact because Link calculated estimated underpayments by comparing the MAC pricing OptumRx used to compensate the remaining Plaintiffs to any higher MAC pricing OptumRx paid another pharmacy on the same day without regard for whether that MAC pricing reimbursement was paid out to a pharmacy seeking reimbursement under the same health plan. (Doc. 457, at 21). Link acknowledged that he made his calculations with imperfect data, and as noted by the remaining Plaintiffs, Link has been unable to utilize complete data because of previous Court rulings denying the remaining Plaintiffs' requests for comprehensive MAC data due to the burden the requests would place on OptumRx. (Doc. 201; Doc. 448, at 58; Doc. 452-16, at 35). Although Link's report extrapolates data and makes certain assumptions about how reflective the highest paid MAC price on a set date is of the

highest MAC price paid to a pharmacy on the same plan as the remaining Plaintiffs, 1) OptumRx does not bring a *Daubert* challenge regarding Link's qualifications or ability to conduct reliable statistical analysis, and 2) Link conducted a complex statistical analysis of data comparing the remaining Plaintiffs' MAC and reimbursement prices to MAC pricing OptumRx utilized while paying other pharmacies and various metrics of market pricing. (Doc. 452-17, at 6-36). OptumRx's challenges to Link's extrapolation of data and utilization of certain assumptions appear to be arguments regarding the weight Link's testimony deserves. *See Walsh v. E. Penn Mfg. Co.*, 555 F. Supp. 3d 89, 116 (E.D. Pa. 2021), *aff'd sub nom. Sec'y, United States Dep't of Lab. v. E. Penn Mfg. Co., Inc.*, 123 F.4th 643 (3d Cir. 2024) (stating "[Defendant] has launched numerous challenges to [the expert's] methodology and calculations, including his admitted extrapolating [of data] . . . these attacks go to the weight of his testimony—'vulnerable as it may very well be'" (quoting *Scalia v. E. Penn Mfg. Co.*, No. CV 18-1194, 2020 WL 5409164, at *8 (E.D. Pa. Sept. 9, 2020)); *see also Lynn ex rel. Lynn v. Yamaha Golf-Car Co.*, 894 F. Supp. 2d 606, 618 (W.D. Pa. 2012) (noting that challenges to "inaccuracy in the data [an expert relies on] goes to the weight of the evidence"); *see also Repa v. Napierkowski*, No. 1:19-CV-00101, 2022 WL 1522360, at *6 (W.D. Pa. May 13, 2022) (stating "[c]hallenges to [the expert's] conclusions based on purported inaccuracies in the data he assumed or relied upon . . ., while proper subjects for cross-examination, go to the weight of the evidence, not its admissibility"). A court may not evaluate issues of weight in a motion for summary judgment. *See Thomer v. Allstate Ins. Co.*, 790 F. Supp. 2d 360, 368 (E.D. Pa. 2011) (stating "[o]n motion for summary judgment, the Court may not weigh the credibility or weight of the evidence"); *see also Sanders v. City of Philadelphia*, 209 F. Supp. 2d 439, 441 (E.D. Pa. 2002) (stating "a court may not consider the credibility or weight of the evidence in

deciding a motion for summary judgment, even if the quantity of the movant's evidence far outweighs that of its opponent"). Taking all inferences in favor of the remaining Plaintiffs, summary judgment is inappropriate because the remaining Plaintiffs present evidence from which a reasonable jury could conclude that OptumRx's improper use of differential MAC pricing led to the remaining Plaintiffs being reimbursed less than they should have been and less than other pharmacies were reimbursed. (Doc. 452-10, at 11-14; Doc. 452-17, at 30-35).

Turning to the remaining Plaintiffs' breach of good faith and fair dealing claims, as discussed *supra* Section III.B, under the Contracts, a successful MAC pricing appeal would lead to OptumRx adjusting MAC pricing for all similarly situated pharmacies which would impact the MAC pricing used to reimburse the remaining Plaintiffs. The remaining Plaintiffs present Link's testimony[8] that if OptumRx had set MAC pricing according to market data when utilizing their discretion and had actually reevaluated MAC pricing when presented with an appeal, instead of almost never granting the appeals or adjusting MAC pricing far less than market data would demand, the remaining Plaintiffs would have been reimbursed more for drugs. (Doc. 452-3, at 63-68). From this, a reasonable jury could conclude that the remaining Plaintiffs suffered damages because they present evidence that OptumRx

[8] OptumRx argues that the remaining Plaintiffs concede that Link's reports do not provide evidence of damages for their breach of good faith and fair dealing claims based on representations the remaining Plaintiffs' counsel made in their briefing in *Lakeview Pharmacy of Racine, Inc. v. Catamaran Corporation*, a separate case before the Court involving similar issues. (Doc. 430, at 31 n.12). While the Court may cite its finding *Lakeview* as persuasive authority, as it may with any federal district court case, the Court will not hold concessions and representations which counsel may or may not have made while representing different clients in a separate action against the remaining Plaintiffs. In this case, the remaining Plaintiffs assert that Link's testimony is relevant to its breach of good faith and fair dealing claims and do not make the concession OptumRx seeks to bind them to. (Doc. 448, at 38-40). Further, Link did provide testimony relevant to Remaining Plaintiffs' appeal-based good faith and fair dealing claims as his reports specifically analyzed MAC pricing appeal data. *See* (Doc. 452-3, at 63-64).

underpaid them. (Doc. 452-3, at 63-68). Further, a reasonable jury could also conclude that because OptumRx's MAC appeal system offered no recourse given OptumRx's alleged bad faith, it also prevented the remaining Plaintiffs from correcting the "$56,832.34 to $355,363.03" in underpayments Link asserts the remaining Plaintiffs suffered. (Doc. 452-17, at 35). OptumRx avers that even if there is evidence that the remaining Plaintiffs received lower reimbursements for certain drugs based on how it set MAC pricing or reevaluated MAC pricing on appeal, that loss is offset by the amount they gained through OptumRx's pricing scheme and OptumRx is entitled to summary judgment on the affirmative offset defense. (Doc. 430, at 31-33). The Court must thus turn to 1) whether OptumRx can bring an offset defense given that it did not include it in its answer and 2) if so, whether OptumRx is entitled to summary judgment on the offset defense.

D. <u>OFFSET DEFENSE</u>

Defendants contend that "if [the remaining] Plaintiffs' contract interpretations and models were accepted by this Court, then their claims would be completely barred by an offset owed by each Plaintiff to OptumRx under those same interpretations and models." (Doc. 430, at 32). California and Illinois courts treat offset differently. In California, offset is an affirmative defense. *See Los Angeles Unified Sch. Dist. v. Torres Constr. Corp.*, 57 Cal. App. 5th 480, 508 (2020) (describing offset as an affirmative defense); *Cathay Logistics, LLC v. Gerber Plumbing Fixtures, LLC*, No. 215CV02926, 2016 WL 3912011, at *5 (C.D. Cal. July 19, 2016) (same). Illinois courts refer to offset as setoff, and it is a counterclaim, not an affirmative defense. *See Benford v. Everett Commons, LLC*, 10 N.E.3d 367, 372 (Ill. App., 2014) (reversing a jury's reduction of damages due to setoff/offset because setoff/offset is a counterclaim and the defendant only pled it as an affirmative defense); *see also Anthony Marano Co. v. Passoff*,

2012 IL App (1st) 112853-U, ¶ 54 (finding that a plaintiff was correct that the defendant improperly labeled an setoff/offset as an affirmative defense rather than a counterclaim but agreeing with a district court's decision not to strike the setoff/offset defense prior to trail because it was a harmless error). OptumRx did not include offset as an affirmative defense or a counterclaim when it filed its initial answer. *See* (Doc. 249). "Generally, failure to raise an affirmative defense in a responsive pleading[ ]results in waiver." *Goddard v. State Farm Mut. Auto. Ins. Co.*, 992 F. Supp. 2d 473, 479 (E.D. Pa. 2014), *aff'd sub nom.* *Feingold v. State Farm Mut. Auto. Ins. Co.*, 629 F. App'x 374 (3d Cir. 2015). Similarly, a defendant must file compulsory counterclaims, or counterclaims arising out of the same transaction or occurrence which do not require additional parties that may deprive the court of jurisdiction, with their answer. *See* Fed. R. Civ. P. 13 (a); *see also* *Sweet St. Deserts, Inc. v. Chudleigh's Ltd.*, No. CIV.A. 12-3363, 2013 WL 5467962, at *2 (E.D. Pa. Sept. 27, 2013) (noting that Rule 13(a) requires defendants to file compulsory counterclaims with their answer and evaluating a motion to amend). OptumRx acknowledges that waiver is an issue with its offset argument and now moves to amend its answer to add offset. (Doc. 432). OptumRx also argues that it is entitled to summary judgment on the issue of offset. ((Doc. 430, at 32). The Court will first address whether OptumRx can amend its answer and then turn to whether it is entitled to summary judgment on offset.

**1. The Court will allow OptumRx to amend its answer.**

Federal Rule of Civil Procedure Rule 15(a)(2) states that "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Courts in the Third Circuit take a forgiving approach to allowing amendments. *See* *Adamo v. Dillon*, 900 F. Supp. 2d 499, 505–06 (M.D.

Pa. 2012), *aff'd*, 539 F. App'x 51 (3d Cir. 2013) (stating "prevailing Third Circuit law establishes a more forgiving approach to parties who fail to raise affirmative defenses in an answer"); *see also Young v. United States*, 152 F. Supp. 3d 337, 353 (D.N.J. 2015) (stating "[c]ourts in this Circuit . . . have taken a more forgiving approach to parties who fail to raise affirmative defenses in an answer, as courts have held that the failure to raise an affirmative defense by responsive pleading or appropriate motion does not always result in waiver" (citations and internal quotations omitted)). Courts apply four non-exhaustive factors when evaluating a motion to amend: "1) whether the amendment has been unduly delayed; (2) whether the amendment would unfairly prejudice the non-moving party; (3) whether the amendment is brought for some improper purpose [*i.e.* in bad faith]; and (4) whether the amendment is futile." *Cot'n Wash, Inc. v. Henkel Corp.*, 56 F. Supp. 3d 613, 620 (D. Del. 2014); *see Mullin v. Balicki*, 875 F.3d 140, 149 (3d Cir. 2017) (articulating the factors). The Court will assess each in turn.

a. Undue Delay

"The 'undue delay' factor recognizes that a gap between when amendment becomes possible and when it is actually sought can, in certain circumstances, be grounds to deny leave to amend." *Mullin*, 875 F.3d at 151. The passage of time alone does not make a delay undue. *See Mullin*, 875 F.3d at 151 (stating "simple delay cannot justify denying leave to amend by itself"); *see also Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 273 (3d Cir. 2001) (stating "delay alone is an insufficient ground to deny leave to amend"). Delay is undue where it is unjustified, the result of dilatory behavior, or due to bad faith. *See Mullin*, 875 F.3d at 151 (stating "delay that is 'undue'—a delay that is protracted and unjustified—can place a burden on the court or counterparty, or can indicate a lack of diligence sufficient to justify a

discretionary denial of leave"); *see also Cot'n Wash, Inc.*, 56 F. Supp. 3d at 621 (stating "[t]he consideration of undue delay requires that [the court] focus on the movant's reasons for not amending sooner" and noting that "[a] finding of undue delay, without a finding of prejudice, may justify denial of a motion to amend when the amendment is grounded on bad faith or dilatory motive, truly undue or unexplained delay" (citations and internal quotations omitted)).

OptumRx filed its answer, which made no mention of offset as an affirmative defense or counterclaim, on July 21, 2021, and did not move to amend until October 13, 2025, over four years later. (Doc. 249; Doc. 432). OptumRx contends that it "could not have moved to amend any sooner . . . because OptumRx only learned of its offset defense from the recently exchanged expert reports. Once OptumRx had this information, it promptly filed the instant motion." (Doc. 433, at 10). The Court disagrees with OptumRx's implication that it could not have foreseen the possibility of offset being a viable defense/counterclaim before 2025. Link's latest report is his third report applying the same general methodology to different data sets. *See* (Doc. 452-17, at 18). When responding to Link's earlier reports, OptumRx's own expert argued in 2021 that OptumRx's method of calculating and utilizing MAC pricing was a robust system used in the industry for good reason, so the Court disagrees with OptumRx's contention that there was no way of knowing that it could have argued that its MAC pricing methodology resulted in better prices than other methodologies. *See* (Doc. 273-3, at 5-11). However, the Court acknowledges that OptumRx's offset defense/counterclaim, as argued, does rely on its own expert's analysis of Link's 2025 report. (Doc. 430, at 24, 27-28). Accordingly, the Court finds that the first factor, undue delay, weighs only slightly against allowing amendment.

b. Prejudice to the Remaining Plaintiffs

OptumRx contends that the remaining Plaintiffs are not prejudiced by amendment "because it is based on [the remaining] Plaintiffs' expert's pricing models, no new discovery is needed, and [the remaining] Plaintiffs [have had] a complete opportunity to rebut OptumRx's showing in the [pending] motions for summary judgment." (Doc. 433, at 9). The remaining Plaintiffs counter that allowing amendment is prejudicial because "Optum's Motion to Amend injects a new issue into this [over] eight-year-old case, further complicating the summary judgment briefing, and increasing the likelihood that the issues will be confused or conflated." (Doc. 445, at 14). The remaining Plaintiffs further aver that they would be prejudiced because in order to respond to OptumRx's contention that overpayments offset under-reimbursements, they will need to conduct additional discovery regarding which drugs OptumRx allegedly overpaid them for. (Doc. 443, at 14-16).

"The determination of prejudice 'requires that [the court] focus on the hardship to the [non-movant] if the amendment were permitted' and may include 'additional discovery, cost, and preparation.'" *Cot'n Wash, Inc.*, 56 F. Supp. 3d at 621 (quoting *Cureton*, 252 F.3d at 273). A party being required to present additional arguments or conduct some degree of additional discovery does not, by itself, create prejudice unless the party shows its "ability to present its case would be seriously impaired were amendment allowed." *Dole v. Arco Chem. Co.*, 921 F.2d 484, 488 (3d Cir. 1990); *see also Dey v. Innodata Inc.*, No. CV 18-978, 2019 WL 4410085, at *6 (D.N.J. Sept. 13, 2019) (finding that a plaintiff was not prejudiced by having to conduct additional discovery and argument in response to a defendant adding counterclaims after the discovery deadline closed). The purpose of requiring a defendant to list affirmative defenses in an answer is to prevent the plaintiff from being subjected to unfair surprise, so courts must

consider whether a plaintiff should be surprised by the fact that they need to respond to a certain defense. *See Robinson v. Johnson*, 313 F.3d 128, 134 (3d Cir. 2002) (stating "[t]he purpose of requiring the defendant to plead available affirmative defenses in his answer is to avoid surprise and undue prejudice by providing the plaintiff with notice and the opportunity to demonstrate why the affirmative defense should not succeed"); *see also Taylor v. Se. Pennsylvania Transportation Auth.*, No. CV 23-2140, 2024 WL 3203318, at *12 (E.D. Pa. June 27, 2024) (noting that a plaintiff was not prejudiced by having to respond to an exhaustion of administrative remedies argument not included in an initial answer because the plaintiff should have known that exhaustion of administrative remedies is an issue in employment cases); *see also Pinegar v. Nicholson*, No. 1:07-CV-0313, 2008 WL 11363781, at *1 (M.D. Pa. May 1, 2008) (finding the same).

Here, the Court finds that the remaining Plaintiffs are not unfairly prejudiced by OptumRx adding an offset defense/counterclaim. OptumRx's offset arguments involve OptumRx's expert evaluating Link's math and methodology and asserting that Link's preferred methodology would result in the remaining Plaintiffs being reimbursed less for drugs, not more. (Doc. 430, at 24, 27-28). The Court cannot find that requiring the remaining Plaintiffs to respond to this argument is prejudicial because they themselves put forward Link's testimony and thus, they should not be surprised that they must respond to challenges to that testimony. *See Taylor*, 2024 WL 3203318, at *12 (finding that a plaintiff was not prejudiced by allowing an affirmative defense which required a plaintiff to defend arguments they themselves put forward); *see also Pinegar*, 2008 WL 11363781, at *1 (finding the same). Accordingly, the prejudice factor weighs in favor of allowing amendment.

c. Bad Faith

OptumRx contends that its "proposed amendment is being made in good faith, based on the expert reports that gave rise to this defense." (Doc. 433, at 11). The remaining Plaintiffs do not present any reason to doubt OptumRx's good faith other than pointing out that OptumRx could have moved to add an offset affirmative defense/counterclaim years ago but failed to do so. (Doc. 445, at 7-8). The fact that a defendant could have moved to amend sooner does not by itself constitute bad faith. *See Adams v. Gould Inc.*, 739 F.2d 858, 868 (3d Cir. 1984) (rejecting an argument that a motion to amend was in bad faith where the opposing party only presented delay as evidence of bad faith); *see also Synthes, Inc. v. Marotta*, 281 F.R.D. 217, 225 (E.D. Pa. 2012) (finding that the fact that a plaintiff could have moved to amend sooner did not constitute bad faith). As discussed *supra* Section III.D.1.a, the Court agrees with the remaining Plaintiffs that OptumRx could have asserted an offset defense/counterclaim years ago. (Doc. 445, at 7-8). However, OptumRx's current articulation of an offset defense/counterclaim is tailored to address a 2025 expert report. (Doc. 430, at 24, 27-28). Accordingly, the Court finds that OptumRx acted in good faith and this factor weighs in favor of granting leave to amend.

d. Futility

OptumRx posits that the amendment is not futile because not only can OptumRx succeed on an offset defense/counterclaim, but it is entitled to summary judgment on the issue. (Doc. 430, at 31-33; Doc. 433, at 11-12). The remaining Plaintiffs contend that amendment is futile because any claims that the remaining Plaintiffs overpaid for drugs are barred by the statute of limitations. (Doc. 445, at 14-19). The Court agrees that OptumRx's assertion of offset is not futile, and for the reasons discussed *infra* Section III.D.2, there is a genuine dispute of material fact which prevents summary judgment on the issue of offset.

Regarding the remaining Plaintiffs' assertion of the statute of limitations, the statute of limitations only applies to defendants using offset offensively to obtain damages from a plaintiff and does not apply defendants using offset defensively to defeat a plaintiff's claim for damages. *See Constr. Protective Servs., Inc. v. TIG Specialty Ins. Co.*, 29 Cal. 4th 189, 191, 57 P.3d 372 (2002), *as modified* (Nov. 14, 2002) (noting that the statute of limitations does not apply where an offset claim is used defensively); *see also Stivers v. Bean*, 5 N.E.3d 196, 204 (Ill. App., 2014) (stating "[i]t is well established that statutes of limitations apply only to claims, not to defenses"). The statute of limitations does not preclude OptumRx from asserting offset as a defense or counterclaim because OptumRx is using offset defensively and not seeking to be awarded any damages. *See* (Doc. 430, at 24, 27-28); *see also Constr. Protective Servs., Inc.*, 29 Cal. 4th at 191; *see also Stivers*, 5 N.E.3d at 204. Accordingly, the Court finds that the futility factor weighs in favor of granting OptumRx's motion to amend.

Overall, although the Court agrees with the remaining Plaintiffs that OptumRx could have brought its offset defense/counterclaim earlier, that fact alone does not warrant the Court deviating from the principle that courts must liberally grant motions to amend that would allow a defendant to assert additional defenses. *See Adamo*, 900 F. Supp. 2d at 505–06; *see also Young*, 152 F. Supp. 3d at 353. Accordingly, the Court **GRANTS** OptumRx's motion to amend (Doc. 432) and will now evaluate OptumRx's motion for summary judgment on the basis of offset.

**2. Summary judgment is not warranted on the issue of offset.**

To succeed on an offset defense/counterclaim, a defendant must show that they are entitled to damages which equal or exceed damages owed to the plaintiff. *See R. M. Sherman Co. v. W. R. Thomason, Inc.*, 191 Cal. App. 3d 559, 563 (Ca. Ct. App. 1987) (noting under

California law that a defendant may raise an offset defense where they show they are entitled to damages in a claim against the plaintiff); *see also Benford*, 10 N.E.3d at 372 (Ill. App. 2014) (noting that under Illinois law, a defendant is only entitled to setoff where they establish they are entitled to damages); *see also Cathay Logistics, LLC*, 2016 WL 3912011, at *5 (noting that offset/setoff is an equitable defense "under which a defendant may seek to offset sums owing to the plaintiff against sums owing from the plaintiff to the defendant"). OptumRx contends that it is entitled to summary judgment because its own expert, Heather Bates ("Bates"), testified that if OptumRx applied Link's methodology to its MAC pricing, OptumRx overpaid the remaining Plaintiffs far more than it underpaid them and thus, the remaining Plaintiffs suffered no damages. (Doc. 439-2, at 32). OptumRx relies heavily on a chart created by Bates which it purports to definitively show that Link's methodology leads to a conclusion that OptumRx overpaid the remaining Plaintiffs. (Doc. 439-2, at 23-24; Doc. 439-7, at 4-5). Reviewing Bates's report, however, Bates was not simply applying Link's exact methodology. *See* (Doc. 439-30, at 32-33). Rather, Bates argued that Link relied on incorrect and insufficient variables. (Doc. 439-30, at 32-33). Bates asserts that she corrected Link's analysis and conducted "[a] more appropriate assessment of OptumRx's MAC pricing, in line with the model's objectives." (Doc. 439-30, at 32-33). Accordingly, the evidence before the Court on the issues of damages is an expert report from the remaining Plaintiffs concluding that OptumRx's method of setting and reevaluating MAC pricing led to the remaining Plaintiffs being under-reimbursed, *see* (Doc. 452-17, at 35), and an expert report from OptumRx stating that OptumRx's method of setting and reevaluating MAC Pricing led to better prices for the remaining Plaintiffs. *See* (Doc. 439-30, at 32-33). These dueling reports create a genuine dispute of material fact precluding summary judgment because, as discussed *supra* Section

III.C, challenges to whether an expert relied on incorrect assumptions or could have applied better methodology speak to the credibility of the expert's report and the weight a jury should afford it. *See Walsh*, 555 F. Supp. 3d at 116 (noting that challenges to an expert's extrapolation of data and the accuracy of his data speak to the weight the jury should afford the expert's testimony); *see also Sanders*, 209 F. Supp. 2d at 441 (noting that a Court may not weigh evidence during summary judgment even where one party's evidence far outweighs the other's). Accordingly, OptumRx's motion for summary judgment is **DENIED**.[9] (Doc. 429).

## IV. CONCLUSION

For the foregoing reasons, OptumRx's motion for summary judgment is **DENIED**. (Doc. 429). OptumRx's motion to amend is **GRANTED** (Doc. 432) and OptumRx must amend its answer to include its offset defense/counterclaim within fourteen days, on or before August 18, 2026. The remaining Plaintiffs' motion for partial summary judgment is **GRANTED in part** and **DENIED in part**. (Doc. 447). The remaining Plaintiffs' motion is **GRANTED** to the extent they seek summary judgment on the following issue:

> The Contracts require that Defendant maintain a single and uniform MAC price for the same drug under the same health insurance plan during the same relevant time frame for all participating providers.

(Doc. 448, at 9).

---

[9] OptumRx also requests that the claims of the over 400 other plaintiffs the Court previously found were subject to arbitration remain stayed. (Doc. 430, at 33). The Court agrees that this action remains stayed for all plaintiffs previously compelled to arbitrate their claims because once a court finds that parties are subject to arbitration, that court must stay the action until arbitration is complete. *See Lloyd v. HOVENSA, LLC.*, 369 F.3d 263, 270 (3d Cir. 2004) (noting that the Federal Arbitration Act ("FAA") dictates "that whenever suit is brought on an arbitrable claim, the Court 'shall' upon application stay the litigation until arbitration has been concluded" (citing 9 U.S.C. §3)); *see also Smith v. Spizzirri*, 601 U.S. 472, 473–74 (2024) (noting that under the FAA, "when a dispute is subject to arbitration, the [C]ourt 'shall on application of one of the parties stay the trial of the action until [the] arbitration' has concluded" (quoting 9 U.S.C. §3)).

The remaining Plaintiffs' motion is **DENIED** to the extent they seek summary judgment on the following issue:

> The Contracts require that each individual MAC price be market-based, i.e. equal to or greater than the applicable benchmark wholesale price for that particular drug, and not on an aggregate basis on a conglomeration of MAC prices[.]

(Doc. 448, at 9).

An appropriate Order follows.

**BY THE COURT:**

**Dated: September 15, 2026**

/s/ Karoline Mehalchick

**KAROLINE MEHALCHICK**
**United States District Judge**